UNITED STATES of America,
Plaintiff-Appellee,

v.

Joe E. GRISSOM, Defendant-Appellant.

No. 80–3269.

United States Court of Appeals,
Fifth Circuit.
Unit A

May 20, 1981.

Robert L. Doyel (Court-appointed), University, Miss., Charles E. Ambrose, Jr., Law Student, Oxford, Miss., for defendant-appellant.

H. M. Ray, U. S. Atty., Alfred E. Moreton, III, Asst. U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before GOLDBERG, GARZA and TATE, Circuit Judges.

GOLDBERG, Circuit Judge:

In our federalist system of government, pernicious conduct may be punishable under federal law, state law or both sets of laws simultaneously. The structure of our government imposes a duty upon the judiciary to decide not only whether a given course of conduct is illegal, but also, by which sovereign's commands such conduct has been outlawed. Before imposing punishment, a court must determine that conduct which may be universally condemned is, in fact, actually proscribed by the laws of the relevant jurisdiction.

The federal judiciary is thus charged with the responsibility of ensuring that an individual who violates state law is not subject to federal punishment for his wrongdoing, absent proper jury instructions and sufficient proof concerning the existence of each of the elements necessary to constitute a given federal offense. In the present case, we do not feel that the jury was properly instructed on each of the elements necessary to qualify the defendant's deceitful actions as the federal offense charged. Hence, the possibility exists that the defendant was convicted for conduct which, while clearly malevolent and perhaps illegal, did not violate federal law. The possible conversion of a state crime—in this case a state misdemeanor—into a federal felony offense mandates a reversal of the conviction.

## I. ALL IN THE FAMILY: BACK-GROUND FACTS

In 1978, defendant Joe Grissom, a soybean farmer, secured four loans from the Farmers Home Administration ("FHA"). He signed a single security agreement for the four loans, which provided that Grissom's farm, equipment and crops would serve as collateral for the loan. The agreement further noted that Grissom would "not abandon the collateral or encumber, conceal, remove, sell or otherwise dispose of it . . . without the prior written consent of the secured party."

As a means of repaying the loans, Grissom was required to have the checks received as payment from the sale of soybeans made payable jointly to the FHA and himself. To insure compliance with this requirement, the FHA circulated a list to grain elevators and other potential crop purchasers of all farmers whose crops were pledged as security to the FHA. This list provided notice to the grain dealers of the FHA's outstanding lien on such crops. Therefore, in order to avoid having to subsequently pay the FHA for the mortgaged crops—and, thus, having to pay twice for the goods—the grain dealers would auto-matically make their payment checks payable jointly to the farmer and the FHA. Since Joe Grissom, his son Danny, and their partnership Grissom Farms had signed as borrowers for the FHA loan, the FHA list circulated to grain purchasers in 1978 contained all three names.

Between October 21, 1978 and January 4, 1979, Joe Grissom made thirty sales of soybeans totalling over $80,000.00 in the name of his father, Grady Grissom. Since Grady Grissom had not signed as a borrower for any FHA loans, his name did not appear on the FHA list; therefore, the checks received as payment for the beans sold in the name of Grady Grissom were not made payable jointly to Grady Grissom and the FHA.

Although the FHA was quickly notified about the sales in Grady Grissom's name, the agency took no immediate action. The FHA County Supervisor, Woodrow Brown, was aware that Joe Grissom and his father had farmed together for several years and that the younger Grissom had set aside a portion of his farm for his father's support. Moreover, Joe Grissom had continued to repay his debt to the FHA during this period. The testimony at trial indicates that the agency believed it would be repaid in full despite the sale of beans in Grady Grissom's name. Therefore, as of March, 1979, the FHA did not plan to take any action against Joe Grissom. However, when the Grissom soybean cupboard became bare, forcing the defendant to default on his loan payments, the government instituted the criminal action at bar. Grissom was charged with thirty counts of disposing of property mortgaged to the FHA with intent to defraud.

## II. JOE AND THE BEANSTALK: GRISSOM'S STORY

In his discussions with the FHA prior to the filing of criminal charges, at trial, and on appeal, Grissom has openly admitted selling an unusually large quantity of beans in his father's name.[1] However, throughout

1. Based on the evidence introduced at trial, it seems fairly clear that Joe Grissom had been selling beans in his father's name for many years in order to support the elder Grissom.

this period, Grissom has consistently and vehemently maintained that he never intended to defraud the FHA. Grissom has argued that his sole motivation behind the contested sales was to "get even" with his landlord.

According to Grissom, his landlord Sullivan had previously agreed to extend Grissom's farm lease in exchange for the defendant's buying a bulldozer and clearing some land. After Grissom had cleared the land, Sullivan attempted to welch on his part of the bargain and to evict Grissom. After a lengthy and heated dispute, the two sides entered into a "settlement agreement" on October 18, 1978, which provided that Grissom would pay a crop rent equal to one quarter of the proceeds from the sale of beans or $62,500, whichever was greater.

Grissom claims that even after signing the settlement agreement, he felt cheated by Sullivan's prior deceit and decided to "turn the tables" on his landlord. Since the amount of crop rent he would be required to pay, pursuant to the settlement agreement, depended on his crop production, Grissom could greatly decrease his rent by selling large quantities of beans in his father's name. This procedure would ensure that the grain dealers would not, as a matter of course, subtract the crop rent from the proceeds of Grissom's sales. In addition, such sales would decrease the amount of sales attributed to Joe Grissom on the grain elevator records—records which were regularly checked by Sullivan to keep track of his rents. Had Grissom's plan been successful, the crop rent payment to his landlord would literally not have amounted to a hill of beans.

Moreover, Grissom has consistently maintained that during the period he sold beans in his father's name, and notwithstanding

such sales, he sincerely believed that he owned sufficient crops to satisfy the FHA obligation. The evidence at trial indicates that Grissom had in fact explained his plan for "getting even" with his landlord to the local grain elevator agent, Tom Green, who was a close friend of regional FHA Supervisor Brown. Grissom has consistently maintained, therefore, that he both expected to repay his loan despite the mislabelled sales, and believed that the FHA was informed of, and had no objection to, his mode of settling the dispute with Sullivan. For these reasons, Grissom has consistently asserted that his deceitful actions were not motivated by an intent to defraud the FHA.

## III. *GRISSOM GETS BEANED: THE DISTRICT COURT'S JURY INSTRUCTIONS*

The statute under which Grissom was convicted, 18 U.S.C.A. § 658 (West 1976), provides, in pertinent part:

> Whoever, with intent to defraud, knowingly conceals, removes, disposes of, or converts to his own use or to that of another, any property mortgaged or pledged to, or held by, . . . the Secretary of Agriculture acting through the Farmers' Home Administration . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both.

As outlined above, throughout the course of the investigation and litigation of this case, Grissom has openly admitted that he "knowingly disposed of . . . property mortgaged . . . to . . . the Farmer's Home Administration." However, section 658 also requires that such actions be motivated by an "intent to defraud" in order to constitute a violation. At trial, Grissom's counsel

---

His usual practice was to reserve the beans produced on approximately one hundred acres for this purpose. The evidence indicates that both the local FHA Supervisor Woodrow Brown and the grain dealers were aware of this practice and approved of it.

There can also be little dispute, however, that the sales which are the subject of the thirty counts in the indictment represent transactions

far in excess of Grissom's traditional practice. Grissom has openly admitted that those sales were not designed as a means of support for his father. Moreover, Grissom has never claimed that the FHA's implied consent to his practice of mislabelling a quantity of beans sufficient to support his father excuses the mislabelled sale of beans worth over $80,000 in a four month period.

argued that the statute's "intent" clause should be read to require proof that Grissom "intended to defraud the government." Thus, Grissom's counsel took the position that if the jury believed that Grissom had acted solely to deceive his landlord, they could not convict him of violating § 658. Both parties had introduced substantial evidence that Grissom's mislabelled sales were motivated by an "intent to defraud" landlord Sullivan; therefore, Grissom's counsel requested the district court to instruct the jury that they could not find a violation of § 658 unless they first found that Grissom intended to defraud the FHA. Grissom's counsel argued that without such an instruction, the jury would be able to conclude that the § 658's "intent to defraud" requirement had been satisfied purely by Grissom's intending to defraud his landlord. Hence, the failure to deliver the instruction would convert the heart of Grissom's defense—that he never intended to defraud the FHA but was merely acting to defraud his landlord—into the conclusive element of his conviction.

The district judge refused to deliver the requested instruction, choosing instead to charge that Grissom could be found guilty as long as he acted "with intent to defraud." The trial judge explained his decision by expressing his belief that the mere intent of a sharecropper to defraud his landlord, plus the use of crops mortgaged to the FHA to accomplish the wrongful deed, would constitute a federal offense under § 658:

> I believe that if the jury believes beyond a reasonable doubt and to a moral certainty that Mr. Grissom converted this property *with intent to defraud anyone* that he would be guilty of a crime under this section, whether it be the Farmers Home Administration, *or Mr. Sullivan* [*the landlord*], or Mr. Hardy [the overseer], or the people to whom he sold the property. I believe it would be a matter for the jury to decide, so I am going to refuse the instruction that has been tendered to me by the defendant in that

regard and accept the one that has been tendered to me by the government, leaving it up to the jury for an interpretation of the statute.

Transcript at 665. (Emphasis added.)

The judge later repeated his view that "the way the statute is worded, the language of the statute, I don't think it is going to be necessary for the jury to believe, in order to convict, that he intended to defraud the Farmers Home Administration." Transcript at 668. In the same vein, the judge admonished Grissom at sentencing: "You set out to get even with your landlord and defraud him, and in the meantime you resulted in defrauding the government." Record, Vol. 6, page 27.

Grissom appeals from his conviction arguing mainly [2] that the district judge erred in his interpretation of § 658 and, thus failed to properly instruct the jury. Grissom argues that § 658 should not be read to condemn, as a federal felony offense, a sharecropper's attempt to deceive his landlord. Although such actions could conceivably constitute a state crime, Grissom urges that this offense not be converted into a federal crime simply because the crops used in such deception were mortgaged to the FHA. Thus, Grissom maintains that it was reversible error for the trial judge to refuse to instruct the jury that, before they could find a violation of section 658, they had to first find that Grissom intended to defraud the government.

## IV. MAKING A FEDERAL MOUNTAIN OUT OF A BEAN HILL

A trial judge's refusal to deliver a requested instruction constitutes reversible error if, but only if, the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense. *Pine v. United States*, 135 F.2d 353, 355 (5th Cir.), *cert. den.*, 320 U.S. 740, 64

---

**2.** See note 11 *infra*.

S.Ct. 40, 88 L.Ed. 439 (1943). See *United States v. Hitsman*, 604 F.2d 443, 446 (5th Cir. 1979). *United States v. Cook*, 586 F.2d 572 (5th Cir. 1978), cert. den., 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979). There can be little doubt that the second and third requirements of the *Pine* test are clearly met in this case. As outlined above, the crux of Grissom's defense was that his actions were not motivated by an intent to defraud the FHA. Therefore, the refusal to instruct the jury on the need to find such intent represented a refusal to present Grissom's main defense to the triers of fact. Additionally, the charge delivered by the trial judge not only failed to "substantially cover" the requested instruction, it actually presented guidance to the jury which completely contradicted the message of the requested instruction. Grissom's requested instruction sought to inform the jury that Grissom's intent to defraud his landlord was legally insufficient to satisfy the "intent to defraud" requirement in § 658; the trial judge's charges effectively instructed the jury to the contrary.

■ Therefore, the only difficult question facing this Court today is whether the first requirement of the *Pine* test—that the requested instruction be substantively correct—is satisfied. The correctness of a requested instruction cannot be considered in the abstract, but must be assessed in light of the remainder of the charge, the contentions of the parties, and the evidence presented at trial. *See United States v. Williams*, 642 F.2d 136 (5th Cir. 1981); *Adjmi v. United States*, 346 F.2d 654, 658 (5th Cir.), cert. den., 382 U.S. 823, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965); *Pine v. United States, supra*, 135 F.2d at 355. Hence, the question before us today is not whether the jury must be instructed in every case charging a violation of § 658 that they must find an "intent to defraud the government;" rather, we need only decide whether, given the evidence presented and the positions adopted by the parties, such an instruction was a correct one in the present case. As noted earlier, the effect of the general instruction on "intent to defraud" actually delivered in this case was to allow the jury to convict Grissom even if it believed he was motivated solely by an intent to defraud his landlord. The effect of the requested instruction would have been to force the jury to acquit Grissom if it believed the defense's story that Grissom acted solely to defraud his landlord. Therefore, in the posture of the present case, the requested instruction would be a correct and necessary part of the charge if, as a matter of law, § 658 cannot be read to punish a sharecropper who acts solely to deceive his landlord while utilizing crops mortgaged to the FHA in accomplishing his deed.[3]

■ By its terms § 658 is silent as to who the intended victim of the fraud must be in order to constitute a violation. Although the government argues that the omission of an intended victim within the statute is dispositive of the case, we find the statutory silence to be wrought with ambiguity. Based solely on the words of the statute, it is impossible to intuit whether Congress meant to punish only those who sought to defraud the government, those who intended to defraud any party whom the federal government has an interest in protecting, or those who intend to deceive anyone at all. Moreover, neither the cases decided under § 658[4] nor the legislative history[5] of

---

**3.** We therefore do not have to decide whether the intent to defraud a private person can ever be sufficient to satisfy the intent requirement of § 658. See note 10 *infra*.

**4.** In the only previous Fifth Circuit case involving a violation of § 658, the indictment charged that the defendant acted with "intent to defraud the government." Thus, the jury was instructed that the government must prove "intent to defraud the government" as a prerequisite to conviction. *United States v. Coleman*, 259 F.Supp. 394 (N.D.Miss.1966); *aff'd* 383 F.2d 989 (5th Cir. 1967). The indictment in this case charged Grissom with concealing crops while acting "with intent to defraud." Record at 1–9. As noted above, the jury charge mirrored this broad language.

**5.** The statute in question, 18 U.S.C. § 658, represents a consolidation of many other statutes spread throughout the United States Code, which imposed criminal penalties for deceiving federal agricultural agencies. Thus, the legisla-

the statute shed any light on the proper interpretation of the "intent to defraud" requirement.

■ However, an application of principles of statutory interpretation and a commonsense appraisal of § 658 lead us to conclude, with much conviction, that the statute should not be read to cover the situation of a sharecropper acting solely to defraud his landlord, simply because the crops used in commiting such fraud happened to be mortgaged to the FHA. The first interpretative principle and one to which the Supreme Court has repeatedly paid tribute provides that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). *See also Ladner v. United States,* 358 U.S. 169, 177, 79 S.Ct. 208, 213, 3 L.Ed.2d 199 (1958); *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955); *United States v. Five Gambling Devices,* 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953) (plurality opinion for affirmance). "When choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Bass, supra,* 92 S.Ct. at 522; *United States v. Universal C. I. T. Credit Corp.,* 344 U.S. 218, 221–222, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). This principle is supported not only by the virtue of longevity, but by the compulsion of logic and the desire for the fair treatment of the citizenry. First, the principle ensures that

"a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931) (Holmes, J.). In the present case, Grissom informed the local grain operator of his plan to deceive his landlord, while fully aware that the grain operator was a friend of regional FHA Supervisor Brown. The FHA voiced no immediate objection to Grissom's plan, because it did not feel that a sharecropper's actions aimed at "getting even" with his landlord would constitute a federal offense. Neither party conceived of section 658 applying to such behavior, until Grissom actually defaulted on his loan. It is certainly possible that had Congress worded section 658 to clearly prohibit the diversion of mortgaged crops with the intent to defraud anyone, Grissom may have structured his behavior so as to avoid employing crops mortgaged to the FHA in seeking his revenge against Sullivan. Second, the strict construction principle is supported by the notion that

"because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies (the instinctive distates against men languishing in prison unless the lawmaker has clearly said they should). H. Friendly Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 209 (1967)."

---

tive history of § 658 includes sections 1026(c) and 1514(d) of Title 7, U.S.C., 1940 ed., Agriculture, and section 1138d of title 12, U.S.C., 1940 ed., Banks and Banking, June 16, 1933, c. 98, § 64, 48 Stat. 269; Jan. 31, 1934, c. 7, § 13, 48 Stat. 347; the Farmers' Home Corporation Act, July 22, 1937, c. 517, Title IV, § 52(c), 50 Stat. 532; the Federal Crop Insurance Act, Feb. 16, 1938, c. 30, Title V, § 514(d), 52 Stat. 76; Aug. 14, 1946, c. 964, § 3, 60 Stat. 1064. The 1933 ancestor to part of § 658 did, in fact, specify that an "intent to defraud the Government" (or subsidized government corporations) was re-

quired as an element of the offense. Although the succeeding legislation—the Farmers' Home Corporation Act of 1937 and the Federal Crop Insurance Act of 1933—did not specifically address the nature of the intent element of the offense, no reason for the change in the wording of these sections is evident from an examination of historical documents connected with the passage of these sections. The language appears to have been simply omitted in the process of consolidating numerous statutes, each worded very differently, into a unified prohibition.

*United States v. Bass, supra,* 92 S.Ct. at 523. Thus, before we risk sending a sharecropper to a federal prison for committing a federal felony offense by acting to defraud his landlord, we must be sure that Congress intended such a result.

■ The second crucial and extremely relevant principle of statutory interpretation which mandates the reversal of Grissom's conviction provides that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass, supra,* 92 S.Ct. at 523.[6] As the Supreme Court noted in *Bass:*

> Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the states.... [We] will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.

*United States v. Bass, supra,* 92 S.Ct. at 523 (citations omitted). Applying this second principle to the current case, there can be little doubt that Mississippi is well-aware of the problem of sharecroppers defrauding their landlords of crop rents. The state has obviously studied the problem, assessed both its severity and the degree of moral turpitude associated with such fraud, and

passed appropriate legislation. The applicable statute provides:

> Any person who, with notice of an employer's, employee's, laborer's, cropper's, part-owner's, or landlord's lien on any agricultural products, and with intent to defeat or impair the lien shall remove from the premises on which it was produced ... anything subject to such lien ... without the consent of [the lienholder], shall, upon conviction, be punished by a fine of not more than five-hundred dollars, and by imprisonment in the county jail for not more than six months, or by either.

Miss.Code Ann. § 97–17–73 (1972) (dating back to 1980). Absent a clear statement, we will not assume that Congress intended to upset the federal-state balance in regulating the relation between a sharecropper and his landlord.[7]

The result mandated by the application of these two principles of statutory interpretation is additionally supported by the often overlooked dictates of horse sense. It would be both unfair and illogical to subject Grissom to punishment of up to five years in jail for committing a federal felony offense, if, in fact, he intended to commit only a state misdemeanor—punishable by a maximum of six months in jail—merely because the crops used to commit the state misdemeanor happened to be mortgaged to the FHA. Had Grissom used other crops to defraud his landlord, he would not have been subject to federal prosecution and, therefore, would have faced a maximum penalty of six months incarceration. Simi-

---

**6.** *See United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 513, 60 S.Ct. 982, 1002, 84 L.Ed. 1311 (1940); *United States v. Five Gambling Devices,* 346 U.S. 441, 449–450, 74 S.Ct. 190, 194–195, 98 L.Ed. 179 (1953) (plurality opinion); *FTC v. Bunte Bros., Inc.,* 312 U.S. 349, 351, 354–355, 61 S.Ct. 580, 581, 583–584, 85 L.Ed. 881 (1941).

**7.** In his opinion in *United States v. McInnis,* Judge Rubin rejected a similar argument by the government by poignantly combining the message of these two principles of statutory interpretation:

> There is still truth in ancient wisdom and law in maxims older than, but respected by, the Constitution. Criminal statutes are to be strictly construed.... Penal statutes must not be stretched to enable the government to prosecute a defendant merely because what he has done is vile, or, as the government here suggests, a violation of state law that is likely to go unpunished by state authorities. 601 F.2d 1319, 1327 (5th Cir. 1979), *cert. den.,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980).

larly, had Grissom used these mortgaged crops to defraud Sullivan but still been able to repay his loan, the evidence indicates that he would not have been charged with a federal offense.[8] The federal government has no interest in punishing a sharecropper who acts solely to defraud his landlord. Hence, it violates common sense to allow the government to punish Grissom in this case, absent a finding that Grissom both defrauded and intended to defraud the government.[9]

The government argues that Congress often regulates misconduct between private parties solely because of the government's interest in the instrumentality used to perpetrate the wrong. *E. g., Barbee v. United States*, 392 F.2d 532, 536 (5th Cir.), *cert. den.*, 391 U.S. 935, 88 S.Ct. 1849, 20 L.Ed.2d 855 (1968) (prosecution for altered currency); *Bachrack v. United States*, 75 F.2d 824, 824–25 (5th Cir. 1935) (prosecuted for counterfeiting of internal revenue stamps); *United States v. Rabinowitz*, 176 F.2d 732, 734 (2nd Cir.), *rev'd on other grounds*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1949) (prosecution for counterfeit postage stamps). These cases are clearly distinguishable. The federal government certainly has an interest in regulating and punishing the subversion of its currency and stamps. If counterfeit forms of currency or stamps could be circulated at will and without fear of prosecution, the public's confidence in such governmental instrumentalities would be destroyed, thereby, completely undercutting the support necessary for the survival of any sovereign. *Barbee v. United States, supra*, 392 F.2d at 532. Moreover, the government does not provide such services as currency or stamps in order to develop new opportunities for thieves to defraud other individuals. Therefore, the government has an interest in not becoming "an unwitting accessory in crime." *Id.* However, in this case, the government does not have any interest in regulating the use or protecting the integrity of mortgaged soybeans. Nor was the government made an accomplice to Grissom's fraud, since the fact that the mislabelled crops were mortgaged to the FHA in no way effected Sullivan's interest or his ability to successfully collect his crop rent. It is worth repeating that the government had no interest in regulating Grissom's defrauding Sullivan: the dispute between a Mississippi landlord and sharecropper over soybean rents is a matter to be controlled solely by Mississippi law. In the absence of a finding of intent to defraud the government,[10] Grissom's conduct constituted at

---

8. *See* page 462 *supra.*

9. The statutory scheme in this case is to be distinguished from the scheme in such cases as *U. S. v. Baker*, 626 F.2d 512 (5th Cir. 1980). In the case at bar, principles of statutory interpretation together with the statutory language convince us that an intent to defraud the government is a prerequisite to conviction, at least under the facts in this case; in *Baker*, requiring intent to defraud the government as a prerequisite to conviction would have required a tortuous and unwarranted reading of the statute in question. Unlike section 658, the statute in question in *Baker*, 18 U.S.C.A. § 1001 (West 1976), did not require that the deceitful action be undertaken with "intent to defraud." Rather, § 1001 sets the punishment for anyone who "knowingly and willfully conceals . . . a material fact" in any matter "within the jurisdiction of any department of the United States." Moreover, the defendants in *Baker* intended to cheat a governmental body and argued only that they did not intend to cheat an entity of the federal government. Finally, the interest of the federal government as discussed in *Baker* did not turn on whether the intended victim of the fraud was a federal or state body. Therefore, § 1001 was clearly intended to prohibit the very crime which the defendants intended to commit and the federal government had a clear interest in punishing that crime. In the present case, § 658 does not seem to have been intended to cover the crime which Grissom actually intended to commit and the federal government would have no interest in punishing the intended offense.

10. Since we are not faced with a case in which the defendant intended to perpetrate a fraud solely against a private party, but which either implicated the federal government as an accomplice or jeopardized a party who the federal government has an interest in protecting, we need not decide whether the "intent to defraud" requirement of § 658 could ever be satisfied by proof of an intent to defraud a private party.

most a state misdemeanor and should be punished as such.[11]

The failure of the district judge to instruct the jury that before they could render a guilty verdict they need find that Grissom acted with "intent to defraud the government" created the possibility that the jury convicted Grissom solely for intending to defraud his landlord. We do not think that § 658 should be read to condemn the deceitful actions of a sharecropper who was motivated solely by an intent to defraud his landlord. Therefore, the conviction below must be reversed for a new trial in which the jury may be properly instructed.

REVERSED AND REMANDED.

11. Grissom has raised three other issues on appeal. The first two additional grounds challenge the district court's refusal to deliver instructions that "honest mistakes of fact negates criminal intent" and that "mistake of law is an excuse" to a specific intent crime. However, given our holding today on the necessity of instructing the jury that Grissom had to act with "intent to defraud the government" to be guilty under § 658, both of these instructions on mistake will be substantially covered in any future jury charge in this case. It is therefore not necessary to decide whether the failure to deliver such instructions constituted reversible error.

Similarly, we need not rule whether Grissom's final issue on appeal—that the prosecutor committed plain error in his closing argument—warrants reversal. The prosecutor's comment in question suggested to the jury that, since Grissom was so indigent that he could not afford an attorney and was represented by appointed counsel, Grissom's testimony regarding his desire and ability to make restitution to the grain dealers could not be believed. While we need not decide whether this comment constituted plain error, we wish to note that it is almost always grossly improper for any lawyer representing the United States government to comment on the indigency of a defendant.