**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Sabino Antonio RUBIO, Defendant-Appellant.**

**No. 87–1255.**

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1987.
Rehearing Denied Jan. 13, 1988.

444

Steve Orr, Austin, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Janet E. Bauerle, W. Ray Jahn, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, POLITZ, and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

Though defendant-appellant Rubio alleges several grounds of error, this appeal presents only two difficult questions: whether it was reversible error for the district court to refuse Rubio's proposed jury instructions defining certain elements of the offense, and whether, without governmental inducement, Rubio would have been predisposed to commit both offenses charged. Finding that defendant was not deprived of an opportunity to have the jury

consider his theory of defense, that he was predisposed to both send and receive child pornography through the mails, and further finding the other grounds of appeal without merit, we *Affirm*.

## I. Facts

Sabino Antonio Rubio ("Rubio") served in the armed forces during the late 1960s. During his tour of duty he worked his way up from enlisted man to Captain. In 1970, he received a "penetrating head wound secondary to a grenade explosion.... [H]e was in a coma for a number of days following this [and] had a neurosurgical procedure done to remove ... contused brain and grenade fragments.... [L]ater, there was a second neurosurgical procedure performed to put a plastic plate in his skull." (R. Vol. III, p. 42). According to psychiatric evidence presented at trial, this injury did not render him insane, but affected his vision and produced certain forms of compulsive behavior. As one manifestation of this compulsive behavior, Rubio became a collector; he collected hats, which he wore initially to cover the scar on his head, and he collected pornographic books and movies, some of which included graphic depictions of children engaged in sexual acts.

Upon discharge from the military, Rubio went to work as a fingerprint technician for the Austin, Texas Police Department. Later he was promoted to patrolman. The grenade wound did not interfere with performance of his duties, and despite his impaired vision he was able to drive a patrol car.

Between August 10 and August 23, 1983 United States Customs Officials working at John F. Kennedy Airport in New York seized three magazines depicting sexually explicit behavior by children, mailed from Sweden and addressed to a post office box in Austin, Texas rented by Rubio. In May of 1984 Customs Officials seized twelve illustrated advertisements addressed to the same post office box, and finally in December of 1984 customs officials seized yet another illustrated advertisement addressed to Rubio's post office box. As a result of these four seizures, the U.S. Customs Service informed Postal Inspector Clyde Davis that they suspected Rubio of violating 18 U.S.C. §§ 2252 and 2255, which prohibit the knowing mailing and receipt of pornographic materials involving children.[1] Davis then asked Postal Inspector Wayne Meyers to initiate a testing procedure. Meyers sent Rubio an introductory letter and questionnaire from Freedom's Choice, a fictitious organization used by the postal service to investigate subjects believed to be engaged in mailing or receiving child pornography. The questionnaire sought to ascertain Rubio's sexual interests and offered to match him with others similarly interested. Rubio returned the questionnaire to Freedom's Choice and indicated that his interests were in the area of teen and pre-teen heterosexual material.

Because of Rubio's response, Inspector Meyers sent a follow-up letter informing Rubio that he had been assigned code number 4592, and that his interests had been matched to another member of Freedom's Choice, code number 4442, with whom he could correspond. Rubio did not respond to this letter.

When no response was received, Inspector Davis wrote to Rubio. Davis used Rubio's code number and introduced himself as Eric Koch. Davis/Koch informed Rubio that he had learned about him through Freedom's Choice, and expressed interest in trading materials dealing with "youngsters." Rubio did respond to Davis's letter and expressed an interest in obtaining ma-

---

1. 18 U.S.C. § 2252 makes a felon of any person who,

 knowingly ... mails any visual depiction, if ... such visual depiction is of [a minor engaging in sexually explicit conduct]; or ... knowingly receives any visual depiction that has been ... mailed ... if ... such visual depiction is of [a minor engaging in sexually explicit conduct].

18 U.S.C. § 2255 defines the term "sexually explicit conduct" as:

 (A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (B) bestiality; (C) masturbation; (D) sadistic or masochistic abuse; or (E) lascivious exhibition of the genitals or pubic area of any person.

terial dealing with teens and pre-teens. Rubio signed this letter "Dino."

In the time between Rubio's response to the Freedom's Choice questionnaire, and his response to Davis/Koch's letter, customs officials seized yet another group of materials addressed to Rubio. As a result of this seizure, Davis, as Eric Koch, wrote another letter to Rubio. Again, Rubio did not respond.

Three months later, in April of 1985, Rubio wrote an unsolicited letter in response to an advertisement placed in "Wonderland," a publication catering to people with an interest in teen or pre-teen sex. In his letter Rubio, this time signing the letter "Tony Martinez," again expressed an interest in trading material involving children. Coincidentally, the "Wonderland" advertisement had also been placed by Inspector Davis, this time using the name Carl R. David. Davis/David wrote Rubio, expressing a desire to make a videotape collecting material dealing with child pornography as soon as he could find a film or two to make it worthwhile. Davis/David offered to share the tape with Rubio if they continued with their correspondence. Rubio did not respond to the letter.

Postal inspectors did not attempt any further contact for seventeen months. In September 1986, however, they seized yet another magazine, entitled "Mini Love," addressed to Rubio. Inspector Davis then had another introductory letter and sexual preference questionnaire sent to Rubio, in the name of "Tony Martinez," from another fictitious club, the Society of Americans for Family and Youth ("SAFY"). The purpose of this letter was to determine if "Dino" and "Tony Martinez" were the same person. The day after the SAFY material was mailed, Inspector Davis, again using the name Eric Koch, wrote Rubio. Davis/Koch offered to sell Rubio six magazines depicting pre-teen and teen sexual activity for $125. He also sent Rubio a price list with descriptions of seven films which he was willing to sell Rubio. Davis/Koch asked to borrow the film that Rubio had mentioned in previous letters.

Rubio responded to both the questionnaire and the letter from Davis/Koch. In response to the questionnaire Rubio again indicated that he was interested in teenage and pre-teenage girls. In response to the letter, Rubio mailed Davis/Koch a film involving two children called "Advanced Young Sex." Rubio also agreed to buy the magazines that Davis/Koch had offered to sell him.

At this point Inspector Davis went to the Austin post office to observe Rubio picking up the mail at his post office box. On September 16, the inspectors decided to attempt a controlled delivery. Inspector Davis put together two separate packages, one containing the magazine, entitled "Mini Love," seized earlier in the month, and the other containing the magazines that Rubio had asked Davis/Koch to send him. Rubio claimed both packages, walked to his car and opened one of the packages. While Rubio was in his car, examining the contents of one of the packages, the inspectors arrested him.

Rubio was tried and convicted of two counts of violating 18 U.S.C. §§ 2252 and 2255. One count charged him with knowingly mailing child pornography. The other charged him with knowingly receiving such material through the mails.

## II. Jury Instructions

"It has long been well established in this Circuit that it is reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent." *United States v. Lewis*, 592 F.2d 1282, 1285 (5th Cir.1979); *see also, United States v. Conroy*, 589 F.2d 1258, 1273 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979) and cases cited therein. "[I]f there is *any* evidentiary support whatsoever for a legal defense, and the trial court's attention is specifically directed to that defense, the trial judge commits reversible error by refusing to charge the jury." *United States v. Goss*, 650 F.2d 1336, 1344 (5th Cir.1981) (emphasis added). Still, the district judge retains substantial

latitude in choosing whether to issue a requested instruction, when the theory of defense is highlighted elsewhere in the charge. Refusal to give a particular requested instruction is reversible error only if:

(1) the instruction is substantially correct;

(2) it is not substantially covered in the charge actually given to the jury; and

(3) it concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present a given defense effectively.

*United States v. Grissom,* 645 F.2d 461, 464 (5th Cir.1981).

■ Recent Fifth Circuit cases have differed over whether judges applying this test are limited to the four corners of the charge, or are instead required to look at the charge, the evidence presented at trial and the argument of counsel taken as a whole. In two cases, *Goss,* and *United States v. Fowler,* 735 F.2d 823, 828 (5th Cir.1984), the panels held refusal of a jury charge to be reversible error without inquiry into whether the theory of defense was encapsulated in argument of counsel or in other aspects of the instruction.

This *per se* approach has been rejected by later cases, which have held that it is necessary to look beyond the four corners of the charge to determine if a defendant's ability to present a defense has been impaired. *United States v. Hunt,* 794 F.2d 1095 (5th Cir.1986); *United States v. Gray,* 751 F.2d 733 (5th Cir.1985); *United States v. Fooladi,* 746 F.2d 1027 (5th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985). *See also United States v. Wellendorff,* 574 F.2d 1289, 1290–91 (5th Cir.1978). As we said in *Grissom,* "The correctness of a requested instruction cannot be considered in the abstract, but must be assessed in light of the remainder of the charge, the contentions of the parties, and the evidence presented at trial." 645 F.2d at 465.

■ But when looking beyond the charge itself to determine the adequacy of that charge, the focus must remain on the words of the judge. We look to the record and the closing arguments to place the words of the judge in context. As we have said, "The burden of giving proper instructions is on the Judge. Fed.Rule Crim.Proc. 30. And it is his words, not the lawyers['], which 'carry an authority bordering on the irrefutable.'" *United States v. Wolfson,* 573 F.2d 216 (5th Cir.1978) (quoting *Moody v. United States,* 377 F.2d 175, 179 (5th Cir.1967)). Thus, although the per se approach rejected in *Hunt* is inappropriate, argument alone will never suffice to compensate for an omitted instruction, where that instruction is legally correct, represents a theory of defense with basis in the record which would lead to acquittal, and where that theory is not effectively presented elsewhere in the charge.

Applying this law to the facts, we find that defendant requested two instructions that were refused. One defined the statutory term "lascivious," and the other defined the statutory term "knowingly." We find that it was not reversible error to refuse either instruction. The first requested instruction did not accurately state the law, and both were substantially covered elsewhere in the charge.

### A. Lascivious—But Not Obscene

■ Rubio requested a lengthy instruction defining the term "lascivious." That instruction was rejected and the Government's requested instruction was given instead. Rubio's requested instruction gave a detailed definition of obscenity as defined in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The following paragraph sets forth the essential elements of Rubio's rejected instruction:

For something to be "lascivious" it must be shown that the average person, applying contemporary community standards and viewing the material as a whole, would find (1) that the work appeals predominantly to prurient interest; (2) that it depicts or describes sexual conduct in a patently offensive way; and (3) that it lacks serious literary, artistic, political or scientific value.

(R. vol. I, p. 46).

This instruction fails under the first prong of *Grissom;* it does not accurately

restate the law. *Miller* sets the standard for sexually explicit expression involving *adults.* The Supreme Court held in *New York v. Ferber*, 458 U.S. 747, 764, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982), though, that an entirely different standard applies to sexually explicit expression involving *children.* When it enacted § 2252 Congress prohibited the mailing of sexually explicit material involving minors without including obscenity as an element of the offense. *United States v. Langford*, 688 F.2d 1088 (7th Cir.), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2433, 77 L.Ed.2d 1319 (1982). Instead of Rubio's requested instruction the judge issued the Government's requested instruction. The definition conformed with the law. It was as follows:

> You're instructed that in determining if a visual depiction constitutes a lascivious exhibition of the genitals or pubic area, you should consider the following factors: (1) whether the focal point of the visual depiction is of the child's genitalia or pubic area; (2) whether the ... visual setting is sexually suggestive, i.e., in a place or pose generally associated with sexual activity; (3) whether the child is depicted in an unnatural pose or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed or nude; (5) whether the visual depiction suggests sexual coyness or willingness to engage in sexual activity; (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer. Of course, a visual depiction need not involve all of these factors to be a lascivious exhibition of the genitals or pubic area. The determination will have to be made based on the overall content of the visual depiction, taking into account the age of the minor.

(R. vol. III, p. 154). Rubio's requested instruction was not legally correct while the instruction given was. Therefore, it was not reversible error to issue the Government's instruction instead of Rubio's.

## B. Knowingly—Definition is Enough

At trial, a psychiatrist testified that, though Rubio's head injury had neither caused a "severe mental impairment," nor rendered him unable to "conform his behavior to the requirements of the law," the injury had affected Rubio's judgment. The psychiatrist also testified that the injury thereby cast doubt upon whether, when Rubio mailed and received the magazines and film, he acted with the subjective mental state required by the statute. To highlight this theory of defense, Rubio's attorney requested the following instruction.

> An act is not done knowingly, intentionally or wilfully if at the time of the act a person by reason of mental disease or defect lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The burden of proof remains on the government to show that a defendant was not suffering from such mental disease or defect at the time of the acts charged.

(R. vol. I, p. 45). The trial court refused this instruction and counsel objected. Even though this instruction was rejected, the trial judge did indicate that the Government had the burden of proving each element of the offense, and that one element of the offense was "knowing" action by Rubio. In addition, the trial judge instructed the jury using Rubio's requested definition of "knowingly":

> The word knowingly, as the term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

(R. vol. III, p. 153).

▬ Reading the rejected instruction as an augmented instruction on the definition of the mental state required by 18 U.S.C. § 2252,[2] the trial court's action re-

2. The rejected instruction can be viewed either as an improper instruction on the insanity defense, or as an enhanced instruction on the definition of the term "knowingly." As an in-

sanity instruction this instruction would have failed under the first prong of *Grissom*, which requires a requested instruction to be substantially correct. Under 18 U.S.C. § 17(a), insanity

quires careful analysis. The Government retains the burden of proving all of the elements of a crime, and § 2252 requires *knowing* mailing or receipt of child pornography. Rubio would not have acted knowingly if he lacked substantial capacity to conform his conduct with the law. Thus, the requested instruction does not misstate the law. The question here is what it would have added to the instructions that were given. The issue here lies with the second and third prongs of *Grissom*— whether the instruction was substantially covered elsewhere in the charge, and whether rejection of the instruction impaired the defendant's ability to present his theory of defense. Thus we are forced to address the problem raised by *Hunt*,

whether the instruction given, examined in context, gave the defendant adequate opportunity to present his theory of defense.

We do not face a situation where no instruction was given whatsoever. The judge gave Rubio's requested instruction on the definition of the term "knowingly." The judge simply refused an instruction which reemphasized the government's burden of proving mens rea as an element of the offense.[3] Moreover, counsel argued this theory extensively to the jury. In oral argument counsel contended that he had not "leaned on the issue particularly heavily," but in fact four of the fourteen pages of defendant's closing argument were devoted to the mens rea defense.[4] The argu-

is an affirmative defense. Rubio's requested instruction places the burden on the government and is therefore legally improper as an instruction on the insanity defense. Rubio's brief leaves it unclear which is intended, and the Government's brief attacks the instruction as if it were an insanity instruction. At oral argument, however, counsel for Rubio made it clear that a mens rea instruction was intended.

3. General instructions on the government's burden of proving each element of the offense were amply set forth in the judge's instructions. The additional language in Rubio's requested instruction expands on the general burden somewhat, but adds nothing of legal significance.

4. The argument was as follows:

Now, there's been some testimony from Dr. Boston about knowledge and intent. . . . He didn't come in here and tell you this man was insane. He didn't tell you he was incompetent. He didn't tell [you] he was totally out to lunch, totally unaware of what he was doing.

He came in here and said, "I examined the man for two hours. And based upon the injury that this man suffered, I believe that he does not—he is not as aware and is not as [ ]knowledgeable as knowing—is not able to know and appreciate what he was doing."

In other words, most of us, ladies and gentlemen—that he had a compulsion. And we got into this little argument with him—or Mr. Jahn did about, "Well all criminals exercise bad judgment."

Well, that's true, ladies and gentlemen. The penitentiary is full of people who exercised bad judgment. It's got people in prison who have exercised bad judgment eight and nine different times from the time they were seventeen years old up until the time the last time they went to prison. Now, what you've heard —what you have here before you ladies and gentlemen, is a forty-five, forty-six-year-old

man, never been in trouble before, never violated the law, never been convicted, certainly, and who, in 1986, according—and '84, according to governmental allegations, exercised bad judgment.

Ladies and gentlemen, the government may say, "Well, Mr. Orr didn't prove to you that because of that hand grenade wound, that's why he did it."

Well, you're right. You know, he would be right if he gets up and tells you that. I didn't prove to you that because this man had a hand grenade injury in 1970 or so that he ordered a dirty book in 1986. And I defy anyone to ever prove anything of that nature. . . .

The question is, ladies and gentlemen, that the government proved to you that this man— that it wasn't because of that brain injury that he did what the government has shown that he did.

Can they say that this man truly is a criminal, that he truly exercised bad judgment of— knowingly and intentionally acting as a criminal with intent to break the law? I submit to you, ladies and gentlemen, that they can't tell you that. They haven't proven that.

The government always has the burden of proving beyond a reasonable doubt that someone knowingly did what the law prohibits them doing. . . .

Now, did he know that he was ordering dirty pictures, ladies and gentlemen? yeah, probably did. Did he know that they were going to be sent to him by the mails? Yeah, maybe so.

But the point is, ladies and gentlemen, did he really appreciate the quality of what he was doing? Did he really have that kind of knowledge that we're going to punish someone for committing a felony?

There's knowing and there's knowing, ladies and gentlemen. I think y'all have different

ment was not a particularly effective one, but this was a result of the weakness of the psychiatric testimony, not of the absence of an instruction.

Thus looking at the charge in context we find that defense counsel had a charge on which to hang his mens rea arguments and did so to the best of his ability. His legal theory was covered in the charge, and his ability to present a defense was not impaired. The argument would not have been substantially different with a different instruction.[5]

We cannot say that the trial court abused its discretion by refusing the requested instruction.

### III. Predisposition—Collector, Trader or Both

Rubio also argues that the extensive governmental effort to entice him to purchase and mail pornography rose to the level of entrapment as a matter of law. There is no question that the conduct of the government officials was offensive. But, the Supreme Court has emphasized that in finding entrapment we must focus on the defendant's subjective mental state—on whether Rubio was predisposed to commit each of the criminal acts charged—not on the challenged official conduct. *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973); *see*

also *id.* at 440–442, (Stewart, J., dissenting).[6]

Entrapment occurs when the Government inspires, incites, persuades or lures a person to commit the offense. *Sorrels v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932) (The police are granted authority "for the purpose of detecting and punishing crime, and not for the making of criminals."). The courts may not convict a defendant when the Government's deception actually implants the criminal design in the defendant's mind. *United States v. Russell*, 411 U.S. at 436, 93 S.Ct. at 1645. The Government bears the burden of proving beyond a reasonable doubt that defendant was predisposed to commit the offense, *United States v. Nations*, 764 F.2d 1073, 1079 (5th Cir.1985), but entrapment is established as a matter of law only when no reasonable jury could have believed that defendant was predisposed to commit the offense. *United States v. Arteaga*, 807 F.2d 424 (5th Cir.1986).

Rubio was convicted of two separate offenses, mailing and receiving child pornography. The Government engaged in extensive efforts to cause Rubio to purchase and to send child pornography through the mail. An entrapment instruction was re-

---

levels of awareness as you go through your daily affairs, as you go through your lives and make decisions. Sometimes you pay attention, and you concentrate on what you're doing, and sometimes you don't ladies and gentlemen. I know that's the way I am.

And I know you may say, "Well, wait a minute, He's ordering stuff back here in '83 and '84. Doesn't that show he knew what he was doing the whole time?"

No, ladies and gentlemen. That shows to you that what he's doing here, he's got this problem, that he's got this problem in his mind, and it's been ongoing probably since the time of that hand grenade injury."

**5.** Indeed, counsel did succeed at focusing the attention of the jury on defendant's mental state. The jury during deliberation submitted an interrogatory to the judge asking "Does "knowingly" mean that the defendant knew he was breaking the law, or just that he knew what was on the film." The question suggests confusion between mistake of law and mistake of

fact. And the judge properly responded simply, "Your verdict must be based upon the evidence admitted in the case and the instructions given you by the Court as to the law." (R. vol. I, p. 15). This exchange suggests that the jury's attention was indeed focused on the requirement that Rubio act knowingly. If counsel's ability to present his defense had been impaired it would be necessary to reverse. Here, though, the charge was read prior to oral argument, and counsel discussed the psychiatric testimony with reference to the definition of "knowingly." He did get that theory before the jury. The jury apparently wrestled with the problem, and concluded that Rubio's behavior fulfilled the requirements of the statute.

**6.** The Due Process Clause reaches offensive governmental behavior, *United States v. Yater*, 756 F.2d 1058, 1064–65 (5th Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985), but "a due process violation will be found only in the rarest and most outrageous circumstances." *Id.* at 1066.

quired, and one was given,[7] but reversal is still necessary if the evidence of predisposition to either send, or to receive child pornography is insufficient as a matter of law.

 *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941), requires us to view the evidence in the light most favorable to the government. The seized magazines provided ample evidence of predisposition to receive pornography. Whether Rubio was predisposed to send child pornography through the mails is a somewhat closer question; language in Rubio's first letter to Koch/Davis can be construed as an offer to trade;[8] the fact of his unsolicited response to the advertisement in "Wonderland," by its terms an invitation to trade, suggests an interest in trading; and, some of the language in the letter responding to the advertisement suggests a reluctant willingness to trade, if that was necessary to achieve his primary goal of increasing the size of his collection.[9] These documents taken together were sufficient to go to the jury on the question of predisposition to send child pornography through the mail.

### IV. The Seized Magazines Were Relevant to Proof of Scienter

 Under Federal Rule of Evidence 404(b), prior crime evidence is only admissible when it is relevant to "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Under this rule, Rubio challenges the admission of the seized magazines as evidence. Relevance is a function of the similarity of the extrinsic offense to the offense charged. *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). Rubio argues that admission of the seized magazines is not relevant to proving intent to send pornographic material through the mail. This is true, but evidence of prior seizures was relevant to proving intent to receive such materials through the mails. The seized magazines were, therefore, admissible.

### V. The Statute Does Not Violate The First Amendment.

 Finally, Rubio argues that 18 U.S. C. §§ 2252 and 2255 are unconstitutional under *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), because they do not define the term "sexually explicit conduct" with sufficient specificity. The Supreme Court has held, though, that because of the governmental interest in

---

**7.** The entrapment instruction given at trial did not distinguish between sending and receiving child pornography. Counsel did not object. Failure to make this distinction was not plain error, but if the evidence of predisposition for either count is insufficient the conviction on that count must be reversed.

The Government cites *United States v. Marchant*, 803 F.2d 174 (5th Cir.1986) for the proposition that seized material is relevant to predisposition to *send* pornography as well as predisposition to *receive* child pornography. This is not the case. *Marchant* involved only receipt of pornography, not sending it. The intent to send is far different from the intent to purchase or receive. Indeed the Government's own witness testified at trial that people interested in child pornography were often extremely reluctant to part with their material. The Government's repeated seizures of material were relevant to Rubio's intent to receive, and there was substantial evidence that Rubio wished to enlarge his collection of magazines and films by purchase.

**8.** This language, which involved only animal magazines would have been insufficient by itself: "If you have some magazines that I may purchase, please advise me. Perhaps I could borrow them. I do have a few magazines of animal sex."

**9.** The advertisement is unambiguously an invitation to trade child pornography. It reads as follows: "[To t]he connoisseur of young boys and girls. I'm interested in expanding my library of rare or unusual references. Photographs, films, magazines and video wanted. Generosity assured." (R. vol. II, p. 25) In response to this advertisement Rubio wrote: "Dear Carl, Saw your ad in Wonderland Magazine. I have long been interested in collecting photos and magazines of the young. Perhaps you could put me in contact with someone who has such material for sale. As I am fairly new in my new-found interest, I don't have much to trade. I would like, however, to buy photos and magazines of pre teen and teen. Hope you can help me get started." (R. vol. II, p. 27) This case is not unlike *Arteaga*, where a cocaine dealer offered to sell cocaine of his own initiative. Here, Rubio offered of his own initiative to trade in child pornography.

protecting children, a substantially lower standard applies to child pornography than to expression involving depiction of sexual conduct by adults. On this theory, the Supreme Court upheld a state statute of a breadth equivalent to that of the Federal statute here in question. *New York v. Ferber*, 458 U.S. 747, 764, 102 S.Ct. 3348, 3358, 78 L.Ed.2d 1113 (1982).[10] Moreover, in this Circuit the constitutionality of the federal statute is a settled question. *United States v. Marchant*, 803 F.2d 174 (5th Cir.1986).

\* \* \* \* \* \*

For the above reasons, the judgment of the district court is *Affirmed*.

---

10. The statute upheld in *Ferber* provided as follows. "A person is guilty of promoting a sexual performance of a child when, knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a child less than sixteen years of age." *Id.* at 750. "Sexual performance" is defined as any performance involving "sexual conduct," *id.* at 751, and "sexual conduct" is defined as "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals." *Id.* We are unable to see a distinction of constitutional import between the use of the term "lewd," and the term "lascivious" in the two statutes.