**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 91-8206
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BARBARA CHANEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

(June 19, 1992)

Before BROWN, GARWOOD, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

This case involves "sham loans" allegedly made by Barbara
Chaney during the years 1983-1985 in her capacity as president
and chief executive officer of Western Bank in El Paso, Texas.
Specifically, Chaney allegedly made loans to individuals with
"related interests" that were actually made for the benefit of
those individuals' businesses.  Following trial, a jury found
Chaney guilty of conspiracy to make false entries in Western Bank
books with the intent to deceive examiners of the Texas
Department of Banking (TDB) and the Federal Deposit Insurance
Corporation (FDIC), a violation of 18 U.S.C. §§ 371, 1005 (Count
One), and making false entries in Western Bank records in
violation of 18 U.S.C. § 1005 (Count Six).  The district court

sentenced Chaney to concurrent five-year terms of imprisonment for each of these counts, suspended execution of the term of imprisonment for Count One, and ordered Chaney jointly and severally liable for restitution to the FDIC in the amount of $1,141,285.00. Chaney appeals, asserting that: (i) the district court erred in refusing her requested good faith instruction, (ii) Count One of the indictment is fundamentally defective because it fails to allege an object of the conspiracy charged, (iii) there is insufficient evidence of a conspiracy to commit an offense, and (iv) restitution is improper because the loss suffered was not the result of the offenses of conviction. Finding no error, we affirm.

## I

The indictment alleges that Chaney conspired with businessmen Richard T. Cassidy, Chris Cummings, Lawrence Bower, and George Wallace to disguise both the purpose and relatedness of loans she made to these individuals--loans that violated both the legal lending limit established by the TDB and the policy instituted by Western Bank to comply with the TDB's regulations.[1]

---

[1] At the time the alleged conspiracy took place, the TDB examined banks jointly with the FDIC and the Federal Reserve Bank and, by regulation, imposed a legal lending limit on state-chartered banks based upon the banks' capital structure and certified capital surplus. *See* TEX. REV. CIV. STAT. ANN. arts. 342-114, 342-202, 342-203, 342-204, 342-208 (West Supp. 1992) (examination function is currently responsibility of Banking Commissioner who appoints bank examiners and assistant bank examiners to carry it out). Dennis Lebo, a bank examiner and former departmental examiner for the TDB, testified at trial that a major part of the examination procedure is to review the banks' loan portfolios. *See* Record on Appeal, vol. 3, at 71, *United States v. Chaney*, No. 91-8206 (5th Cir. filed July 31, 1991)

-2-

This Western Bank lending policy--a written 26-page lending

policy that explicitly warned against concentration of credit to

related interests[2]--was instituted in 1983 after bank examiners

["Record on Appeal"].  According to Lebo, if examiners determine
that a loan is unsatisfactory (for example, in instances where
the legal lending limit is exceeded), they assign it an
unsatisfactory loan classification and include it in their
examination report.  All loans classified unsatisfactory during a
bank examination are checked again during the next examination.
*Id*. at 81.

[2]     The policy stated, in  part:
     A concentration is defined as any group of related
credits, either by individual borrower or specific
industry, that equals or exceeds 25% of the bank's
gross capital funds.  Management is aware of the
inherent risks involved in lending large sums to a
group of related borrowers or to a single industry.
     All loan request [sic] should detail related
credits of individual borrowers.  This detail should
include all direct, indirect and related debt of the
borrower, all overdrafts, unfunded commitments or lines
of credit, and letters of credit.  Each such
concentration will be considered individually at the
time of any new loan request.  Generally speaking a
concentration to any one individual borrower or group
of borrower [sic] is discouraged, and will require
prior approval of the president.
Government Exhibit 79, at Part XIX (entitled "Concentrations of
Credit"), *in* Record on Appeal.  The policy also:
     (1) established lending limits and a method for making
     relevant calculations;
     (2) stated that loan officers were responsible for
     protecting depositors' funds and stockholders' equity;
     (3) required written loan authorization by officers for
     all loans;
     (4) required on-site inspections for all commercial
     business loans of $50,000 or more and recommended such
     inspections for all commercial business loans;
     (5) required loan officers to "determine that the
     borrower is basically honest and is a credit-worthy
     individual"; and
     (6) required loan officers to:
          (i) understand the specific purpose of the
          loan;
          (ii) understand the source and plan of
          repayment with emphasis on the cash flow of
          the company and its ability to repay;

from the TDB adversely classified $847,000 of Western Bank's assets and urged the bank's management to "expedite its formulation and implementation of written loan policy guidelines as the substantial increase in severity of loan classification presents cause for concern."[3]

**A**

During 1983-1985, Chaney authorized numerous loans in the names of Bower, Cassidy, Cummings, Wallace, CCG Investment ("CCG"), C.O.R., Incorporated ("COR"), and ResortAmerica Corporation ("RAC"). The record establishes that the interests of these individuals and entities clearly overlapped: (i) Cummings and Wallace were in business together in CCG, RAC, COR, and other entities;[4] (ii) Bower was associated with Cummings and

---

> (iii) evaluate back-up sources of repayment; and
> (iv) find that the purpose, plan of repayment, and collateral were acceptable, reasonable, practical, and accomplishable within the normal framework in which the borrower operated, and document any undesirable features.

*Id*. at Parts XIV-XV (entitled "Basic Credit Policies" and "Loan Review").

[3]   Record on Appeal, vol. 4, at 182-84. These examiners also reported that "[c]ontinued close credit supervision is warranted to prevent further deterioration in the bank's expanded loan portfolio. . . ." *Id*. The examiners concluded that "[t]he bank's volatile dependency ratio of 10.23% continues to compare unfavorably with peer group norms" and that "[c]urrent examination's classifications substantially reduce an already marginal reserve account and it is recommended that current year's provisions be sufficient to maintain the reserve at or near peer group levels. . . ." *Id*. An auditor discovered many of these same problems.

[4]   Record on Appeal, vol. 3, at 281 (Bower Testimony):
Q     Who are you in business with?

Wallace from 1983-85 as a real estate broker, and, as of 1985, described himself as a "partner" with Cummings and Wallace in CCG, RAC, and other entities;[5] (iii) Cummings, Wallace, and Bower often borrowed money under their own names for the benefit of

---

A  My two partners are Chris A. Cummings and George B. Wallace.
Q  How long have you been in business with Chris Cummings and George Wallace?
A  Since 1983 as a broker with them and then I became a partner in their entities in January and April of 1985.
Q  What entities are we talking about?
A  CCG, ResortAmerica and then subsequent to that, other entities that were created.

[5]  *Id*.  The three bought, subdivided, and sold real estate together.  *Id*. at 283 (Bower testimony):
Q  Now what kinds of things would your organization, you, Chris Cummings and George Wallace get involved in?
A  We would look at the programmata of real estate activities in this area, Ruidosa, New Mexico, and then later, into Houston, Texas.  Primarily, we were active here.  We would look at land deals.  We would buy land, subdivide it, break it up and sell it in small parcels on a note and Deed of Trust.  We would buy buildings, get the buildings turned around and increase occupancy and increase the income of it and then sell it.

their businesses, and Chaney was aware that they did so;[6] and (iv) Cassidy was a shareholder in RAC until 1982.[7]

In October 1983, Chaney and Bower negotiated the first of these loans--a $125,000 loan to CCG. Chaney knew that CCG was a partnership owned by Wallace and Cummings.[8] In June 1984, Chaney and Bower negotiated another loan for CCG in the amount of $50,000. The following month, Bower negotiated a third loan, this one for $200,000, which paid off the existing $125,000 and

---

[6]     Record on Appeal, vol. 3, at 307-08 (Bower testimony):
    A    When we discussed the restructuring, [Chaney] said [she'd] like to put all of these notes into individual names.
                              * * *
    A    We often borrowed money in our own name for the benefit of the corporations. That was not unusual.
    Q    And Barbara Chaney knew that?
                              * * *
    A    Yes.
*Id*. at 296 (Bower testimony):
    Q    And did you have discussions to that effect with Barbara Chaney, did she know that you and Chris Cummings and George Wallace were related borrowing entities?
    A    I believe she did.


[7]     Record on Appeal, vol. 3, at 282 (Bower testimony):
    Q.    Okay. What about Richard Cassidy?
    A.    Mr. Cassidy was a shareholder and owner partner in ResortAmerica before I came on and I believe in 1982[.] [A]fter the hotel El Paso Del Norte was sold, he wanted to become less active and he sold his stock back to ResortAmerica.

[8]     This fact was mentioned during the loan negotiations. *See* Record on Appeal, vol. 3, at 286 (Bower Testimony):
        Q    And in the course of your conversations with Barbara Chaney, did it come up that CCG Investment was an organization, a partnership that was owned by George Wallace and Chris Cummings?
        A    I'm sure it did.

-6-

$50,000 notes and enhanced CCG's debt by $25,000. Although this $200,000 loan was made in CCG's name, according to Bower, the funds from the loan went to RAC and CCG "because the assets that the two entities owned were intermingled."[9]

The upgrade of loans continued, and the overall amount of liability grew. Western Bank made three loans to the related borrowing entities on December 28, 1984: (i) a $550,000 loan was made to RAC; (ii) COR received a $600,000 loan, authorized by Chaney, which was used to pay off a $600,000 loan in CCG's name; and (iii) Wallace negotiated a $600,000 loan for working capital for a condominium project in Ruidoso, Mexico (the Tierra Condominium) involving Cummings, Wallace, and Bower. All three notes were due on March 29, 1985. On that day, Bower made it clear that the borrowers were not ready to pay the outstanding principal, and the three loans were renewed until June 27, 1985.

**B**

During the spring of 1985, a bank examination appeared imminent. Although the legal lending limit for related borrowers at Western Bank was $665,000,[10] the three related loans and interest owed to Western Bank by Cummings, Wallace, and Bower-- all of which were due to expire on June 27, 1985--totalled $1,750,000-2,000,000. When Bower approached Chaney about

---

[9] Record on Appeal, vol. 3, at 294. For example, CCG and RAC used the same land as collateral.

[10] Western Bank's legal lending limit was $646,500-$665,000 through 1985. Chaney's lending limit under the bank's policy was $600,000 from August 31, 1984 until December 17, 1985, and then became the legal lending limit of the bank.

renewing the loans at their expiration in June 1985, Chaney agreed but decided that the loans had to be "restructured"--that is, Chaney wanted the loans to be under the names of individuals.

Bower agreed to restructure and assumed one of the loans; Cummings took another, and Wallace was already on the third. According to Bower's testimony, Chaney said Cummings would not be acceptable and suggested that Cassidy's name be used on the renewal of the $550,000 RAC note. When Bower approached Cassidy, he agreed to allow his name to be used and did not ask for any of the loan proceeds.[11] This loan was renewed, RAC's name was replaced with Cassidy's, and the loan amount was increased from $550,000 to $645,000.[12] Chaney also renewed the $600,000 COR

---

[11] Bower also testified that he, not Cassidy, handled all of these loan negotiations and that, from their conversation about restructuring the loan, Chaney would have known that the $645,000 in loan proceeds would be used for the benefit of RAC. Record on Appeal, vol. 3, at 312:

> Q  Did, was it very very clear that the money that was funding that six hundred and forty-five thousand dollar loan was for the benefit of ResortAmerica?
> A  In my view it was, yes.
> Q  Did you discuss the purpose of that loan with Barbara Chaney?
> A  I believe that the conversation was that it was, in restructuring at the previous working and capital loan, that was the purpose of it.

The bank's internal loan documents ("spread sheets") were blank in the spaces where related Western Bank debt and collateral pledged as support for related loans should have been listed, and where Cassidy should have indicated that he was borrowing for another person or entity.

[12] When the loan check was issued to Cassidy on July 31, 1985, "For deposit only, 191-141-9, ResortAmerica Corporation" was typed on the back of it. Cassidy endorsed the check and deposited it into the Texas Commerce Bank account of RAC; $565,453.47 ($550,000 plus interest) of the loan went to pay off the $550,000 RAC loan at Western Bank. Bower, not Cassidy, made

-8-

loan, changing the borrower to Bower and extending the loan amount to $650,000,[13] as well as the Wallace loan, which was increased from $600,000 to $648,000.[14]

In November 1985, Chaney authorized another $440,000 loan to Bower. This loan was made when Bower told Chaney that he had a $187,000 loan due at another bank which he was unable to repay. Chaney chose to loan Bower $440,000 so that he could use $224,000

---

interest payments on this loan--payments that were made from RAC's account and, when that account was insufficient, from the CCG account.

[13] Although the $650,000 actually went to RAC, the spread sheets for this loan indicated that its purpose was "investment in real estate." As on the Cassidy loan, the "related debt" section of the spread sheets was left blank.

[14] Just as the loans shifted hands, so did the underlying collateral. As collateral for the $645,000 loan, Cassidy had pledged a 640-acre section of land in El Paso referred to as "the public school lands" to Western Bank--land transferred to Cassidy when he agreed to allow his name to be used for the loan. Cassidy then conveyed another section of this "public school" land to Bower for $10 by warranty deed, and Bower pledged his newly-acquired share of the same land as collateral for the $650,000 loan made in his name. Although Chaney was aware that Western Bank's lending policy required her to conduct an on-site inspection of all collateral securing loans of $50,000 and more, Chaney did not conduct such a personal inspection of the property; instead, she sent her assistant to fly over the land in a helicopter. Although Cassidy's financial statement submitted for the $645,000 loan listed this 640 acres as worth $1,279,360 and Bower submitted an appraisal valuing the land at $1,999 per acre, a government appraiser--finding the land to have serious water shortage problems and no evidence of residential development--valued this land at just $195-$315 per acre. Moreover, when Chaney permitted this loan to be increased to $645,000 and allowed the borrower's name to be changed to Cassidy, she also allowed this land to replace a second mortgage in the Tierra Condominium--property valued at $1,200,000-$1,600,000--which had secured the loan.

-9-

of the loan for a down payment on other real estate.[15] Nevertheless, the loan presentation, initialed by Chaney, states that the loan's purpose was to "payoff Montwood National Bank"; there is no indication in the loan presentation or in the spread sheets that the loan would be used for investment in other real estate. When this loan was renewed in 1986, the bank's work sheet and Bower's renewal request stated that the original purpose of the loan had been investment in real estate, and the "related debt" section of the spread sheet was blank.

## C

Western Bank was examined by the TDB and the FDIC in June 1986, and the Chaney-Bower negotiated loans caught the examiners' attention.[16] In September 1990, Chaney, Cummings, Bower, and Wallace were indicted for misapplication of Western Bank funds and making false entries in the bank's books.[17] Cummings, Bower,

---

[15] Record on Appeal, vol. 4, at 213 (Chaney testimony):
Q    Two hundred and twenty-four thousand dollars was a figure that you chose?
A    It was a figure that I chose.
Q    Why?

* * *

A    Because as I understand the transaction, Mr. Bower was involved in some real estate transactions whereby the money was going to go to a gentlem[a]n name[d] Newell Hayes who has been identified.

[16] Because of a manpower shortage at the Texas Department of Banking, there was no on-site examination of western Bank by bank examiners from April 1984 until June 1986.

[17] Specifically, the indictment charged:
*Count One*. Conspired to wilfully misapply monies, funds, and credits entrusted to the care of Western Bank in violation of 18 U.S.C. § 371; conspired to make false entries in the books of Western Bank with the intent to deceive the examiners of the Texas Department

-10-

of Banking and the Federal Deposit Insurance Corporation ("FDIC"), in violation of 18 U.S.C. § 1005, such conspiracy being a violation of 18 U.S.C. § 371;

**Count Two**.  Aided and abetted by Richard Cassidy (a named, unindicted co-conspirator), knowingly made or caused to be made a false entry in a book, report or statement of Western Bank in connection with a nominee loan in the amount of $645,000 made in Cassidy's name, in violation of 18 U.S.C. §§ 2, 1005;

**Count Three**.  Aided and abetted by Cassidy, misapplied monies, funds, and credits entrusted to the care of Western Bank in violation of 18 U.S.C. §§ 2, 656 by funding a $645,000 nominee loan in Cassidy's name when she knew that the true borrower and recipient of $565,453.46 of the loan was ResortAmerica Corporation, and when she knew that to extend credit to ResortAmerica Corporation would exceed and violate Western Bank's legal lending limit,;

**Count Four**.  Aided and abetted by Lawrence Bower (a co-defendant who plead guilty), made a false entry in a book, report, and statement of Western Bank in connection with a nominee loan in the amount of $440,000 to Bower, when she made the records of the bank reflect that Bower was the borrower, although she knew that the true borrower and recipient of the proceeds were Chris A. Cummings and ResortAmerican Corporation--a violation of 18 U.S.C. §§ 2, 1005;

**Count Five**.  Aided and abetted by Bower, misapplied and caused to be misapplied monies, funds, and credits entrusted to the care of Western Bank, in violation of 18 U.S.C. §§ 2, 656, by funding a nominee loan in the amount of $440,000 in the name of Bower, when she knew that the proceeds of the loan would go to benefit, among others, ResortAmerica Corporation, and she knew that to extend credit on that date to ResortAmerica Corporation would exceed and violate Western Bank's legal lending limit; and

**Count Six**.  Made and caused to be made a false entry in a book, report, and statement of Western Bank, with the intent to injure and defraud Western Bank and to deceive the examiners and agents of the FDIC and the Texas Department of Banking; falsely stated in an Officer's Questionnaire that since the last bank examination she had made no extensions of credit for the accommodation of others than those whose name appeared on the bank's records or on credit instruments in connection with such extensions, when she in fact knew that she had extended credit for the accommodation of Cummings and ResortAmerica Corporation, and the names Cummings and ResortAmerica Corporation did not

-11-

and Wallace were also charged with offenses related to the submission of false financial statements to Western Bank in violation of 18 U.S.C. § 1014.  Chaney's co-defendants pled guilty to submitting false financial statements, and Chaney went to trial.

The district court granted Chaney's pre-verdict motion for judgment of acquittal as to the conspiracy to misapply funds count (part of Count One) and the substantive misapplication of funds counts (Counts Three and Five).  However, the jury found Chaney guilty as to the false entry conspiracy charge (a portion of Count One) and as to the substantive false entry charge concerning a Western Bank Officer's Questionnaire (Count Six),[18] but acquitted her on the remaining counts (Counts Two and Four).[19]  Chaney moved for judgment of acquittal notwithstanding the verdict as to Count One, and that motion was denied.  Chaney appeals.

---

appear on the bank's records or on credit instruments in connection with such extensions--all in violation of 18 U.S.C. § 1005.

[18]    During the 1986 Western Bank examination, Chaney was asked to respond to an Officer's Questionnaire, question five of which required Chaney to "[l]ist all extensions of credit made since the last examination for the accommodation of others than those whose names appear on the bank's records or on credit instruments in connection with such extensions."  Chaney's response was "None."

[19]    *See supra* note 17 (summarizing the indictment).  The district court granted Chaney's Rule 29(a) motion for judgment of acquittals on the charges of conspiracy to misapply funds (part of Count One) and on all substantive misapplication of funds counts (Counts Three and Five), but denied this motion as to the remaining counts.

## II

Chaney raises the following contentions:

(**a**) the district court erred in refusing her requested instruction that good faith belief in the truth of her statements is a complete defense to the charge of making a false entry in Western Bank's books;

(**b**) Count One of the indictment is fundamentally defective because it fails to allege an object of the conspiracy charged;

(**c**) the district court erred in refusing to grant Chaney's motions for judgment of acquittal as to Count One on the grounds that there is insufficient evidence of a conspiracy to commit an offense; and

(**d**) the district court erred in imposing restitution because the loss suffered was not the result of the offenses of conviction.

## A

Chaney contends that her conviction on Count Six--the substantive false entry charge concerning her response to a question on the Officer's Questionnaire--should be reversed because the district court refused to give her proposed good faith instruction.[20]  We disagree.

---

[20]    Chaney requested the following instruction:
    The good faith of the defendant Barbara Chaney is a complete defense to the charges in all counts of the indictment because good faith on the part of the defendant is simply inconsistent with a finding of knowingly and willfully making false statements as alleged in the indictment.
    A person who acts on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong.  An honest mistake in judgment or an error in management does not rise to the level of knowledge and wilfulness required by the statute.
    This law is intended to subject to criminal punishment only those people who knowingly and willfully attempt to deceive.  While the term good

-13-

We afford the district court substantial latitude in formulating its instructions, and we review a district court's refusal to include a defendant's proposed jury instruction for abuse of discretion. *See United States v. Sellers*, 926 F.2d 410, 414 (5th Cir. 1991); *United States v. Rochester*, 898 F.2d 971, 978 (5th Cir. 1990). In applying this abuse-of-discretion standard, we read the district court's instruction as a whole to determine whether that instruction fairly and accurately reflects the law and covers the issues presented in the case. *See United States v. Daniel*, 957 F.2d 162, 169-70 (5th Cir. 1991) (viewing jury instruction as a whole and holding that lack of good faith instruction and inclusion of instruction on deliberate ignorance does not constitute reversible error); *United States v. Hagmann*, 950 F.2d 175, 180 (5th Cir. 1992) ("When a charge is challenged on appeal, we evaluate it in its entirety, looking to see whether

faith has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to comply with known legal duties.

In determining whether or not the government has proven that the defendant acted in good faith or acted knowingly and willfully in making false statements, the jury must consider all of the evidence in the case bearing on the defendant's state of mind.

The burden of proving good faith does not rest with the defendant because the defendant does not have an obligation to prove anything in this case. It is the government's burden to prove to you, beyond a reasonable doubt, that the defendant Barbara Chaney acted knowingly and willfully to make false statements.

If the evidence in the case leaves the jury with a reasonable doubt as to whether the defendant Barbara Chaney acted in good faith, the jury must acquit the defendant.

Record on Appeal, vol. 1, at 47-49.

-14-

the charge *as a whole* was correct.").  Specifically, where the contention is that the district court has refused to give an instruction, we determine whether the requested instruction:  (1) is a correct statement of the law; (2) was substantially given in the charge as a whole; and (3) concerns an important point in the trial, the omission of which seriously impaired the defendant's ability to present a given defense effectively.  *See United States v. Marcello*, 876 F.2d 1147, 1151 (5th Cir. 1989); *United States v. Rubio*, 834 F.2d 442, 447 (5th Cir. 1987), *quoting United States v. Grissom*, 645 F.2d 461, 464 (5th Cir. 1981).

For section 1005 purposes, specific intent is the "intent to injure or defraud a bank, . . . or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank . . . ."  18 U.S.C. § 1005; *United States v. McCright*, 821 F.2d 226, 233 (5th Cir. 1987), *cert. denied*, 484 U.S. 1005, 108 S. Ct. 697 (1988); *United States v. Adamson*, 700 F.2d 953, 965 (5th Cir.) (en banc), *cert. denied*, 464 U.S. 833 (1983).  The district court instructed the jury that it was required to find beyond a reasonable doubt that Chaney "made such [false] entry wilfully with knowledge of its falsity," and that she did so "*with the intent of defrauding or deceiving the person named in the indictment.*"[21]  The district court also instructed the jury that:

---

[21]    Record on Appeal, vol. 5, at 62 (emphasis added).

-15-

[a] person acts with intent or intentionally with respect to an act or a result of her conduct if it is her conscious objective or desire to engage in the act or to cause the result.

\* \* \*

The word knowingly as that term has been used from time to time in these instructions means that the act was done voluntarily and intentionally, not because of mistake or [accident].  The purpose of adding the word knowingly as that term has been used from time to time is to [e]nsure that no one will be convicted for an act done because of a mistake or accident or other innocent reason . . . .  Evidence that Barbara Chaney acted or failed to act because of being misinformed of or not knowing applicable Federal regulations is a factor you may consider in determining whether she acted or failed to act with a requisite criminal intent required for conviction. [22]

Although this instruction is not the one proposed by Chaney, it is, in essence, a good faith instruction.  Moreover, Chaney had an opportunity to argue good faith to the jury, and she substantiated this assertion by testifying that, based on her understanding and knowledge of the loans at the bank and the applicable regulations, it was her good faith belief that she answered the Officer's Questionnaire correctly.[23]  *See Rochester*,

---

[22]    Record on Appeal, vol. 5, at 64, 65-66.

[23]    Chaney's counsel strenuously argued to the jury that Chaney acted in good faith:

We may agree or disagree to the answer that was put down on question five about the accommodation of other parties, none, when those other parties had no loans at the bank . . . . Well, maybe that was the right answer and maybe it was the wrong answer, we may agree or disagree on that . . . . She may have done it differently today than she did then, but agreeing or disagreeing, that we would have done things differently at different times, is not a crime.  Mrs. Chaney didn't intend to defraud her bank.  She didn't intent to deceive anyone.  She acted in a way that she thought was proper.

\* \* \*

If Mrs. Chaney made an entry or answered a question

-16-

898 F.2d at 978 ("[F]ailure to instruct on good faith is not fatal when the jury is given a detailed instruction on specific intent and the defendant has the opportunity to argue good faith to the jury."). Accordingly, we find that (1) the instruction given by the district court is a correct statement of the law, (2) a good faith instruction was substantially given in the charge as a whole, and, (3) although the specific intent element of section 1005 of Title 18 concerns an important point in Chaney's trial, the omission of which would have seriously impaired Chaney's ability to present an effective good faith defense, we find that this point was dealt with adequately during Chaney's trial and in the district court's instructions. *See Rubio*, 834 F.2d at 450 (holding instruction sufficient where defense counsel "had a charge on which to hand his mens rea arguments[,]" his "legal theory was covered in the charge, and

---

differently than you or I might do today, that doesn't mean nor should it that her actions were criminal. She made a mistake in judgment so be it, but we don't convict people for making mistakes.
Record on Appeal, vol. 5, at 28-29, 31. This assertion was substantiated by Chaney's testimony:

> Q    And if you could read that question to us?
> A    "List all extensions of credit made since the last examination for the accommodation of others than those whose name[s] appear on the bank's record or on credit instruments in connection with such extension[s]."
> Q    Okay, and what was your answer to that?
> A    None.
> Q    And why did you answer that?
> A    Because there were none.
> Q    Okay. So you felt that that is a true and correct answer?
> A    That's right.

Record on Appeal, vol. 4, at 164.

-17-

his ability to present a defense was not impaired").[24]

Therefore, we find that the district court's refusal to give the good faith instruction proposed by Chaney does not constitute reversible error.[25] *See Rochester*, 898 F.2d at 978, *citing United States v. Hunt*, 794 F.2d 1095 (5th Cir. 1986) (holding that failure to instruct on good faith is not fatal when jury is given detailed instruction on specific intent and defendant has opportunity to argue good faith to jury); *see also United States*

---

[24] In *Rubio*, as in the case before us, defense counsel proposed an intent instruction which was the district court refused to give, choosing instead to charge the jury with its own variation of this instruction. In upholding the district court's instruction, this court stated:

> We do not face a situation where no instruction was given whatsoever. The judge gave Rubio's requested instruction on the definition of the term "knowingly." The judge simply refused an instruction which reemphasized the government's burden of proving mens rea as an element of the offense. Moreover, counsel argued this theory extensively to the jury.

*Id*. at 449-50.

[25] Chaney also raises a related but subtler contention-- that the language "a belief or opinion honestly held" and "defendant's state of mind" is significant in that it reflects a more expansive approach to the good faith defense recently recognized by the Supreme Court in *Cheek v. United States*, __ U.S. __, 111 S. Ct. 604 (1991) (defendant charged with willful failure to file tax return is entitled to instructions that inform jury that good faith belief that one need not file tax return need not be objectively reasonable to be valid defense). We find Cheek inapplicable because its statutory interpretation of "willfulness" is "an exception to the traditional rule and is a statutory element of special treatment of criminal tax offenses." *United States v. Arditti*, 955 F.2d 331, 340 (5th Cir. 1992); *see United States v. Dockray*, 943 F.2d 152, 156 (1st Cir. 1991) (Holding that *Cheek* is unique to tax evasion cases since the willfulness requirement in tax evasion cases "is not synonymous with the intent to defraud requirement in the mail and wire fraud statutes."); *United States v. Dashney*, 937 F.2d 532, 539 (10th Cir.) (refusing to extend the *Cheek* statutory interpretation of "wilfulness" to other criminal statutes), *cert. denied*, __ U.S. __, 112 S. Ct. 402 (1991).

-18-

*v. Chenault*, 844 F.2d 1124, 1130 (5th Cir. 1988) (holding that omitting good faith instruction is not reversible error where jury is not prevented from considering that defense).

### B

Chaney challenges Count One of her indictment, contending that it is fundamentally defective because it fails to allege an object of the conspiracy charged.  We disagree.

Whether an indictment sufficiently alleges the elements of an offense is a question of law which we review do novo.  *See United States v. Shelton*, 937 F.2d 140, 142 (5th Cir. 1991) (citation omitted); *United States v. Contris*, 592 F.2d 893, 896 (5th Cir. 1979).  Although an indictment must be a "plain, concise and definite written statement of the essential facts constituting the offense charged" to satisfy Rule 7(c) of the Federal Rules of Criminal Procedure, this court has held that:

> an indictment is sufficient if it [1] contains the elements of the offense charged and [2] fairly informs a defendant of the charge against him[,] and [3] enables him to plead acquittal or conviction in bar of future prosecutions for the same offense.

*United States v. Hagmann*, 950 F.2d 175, 183 (5th Cir. 1991), *quoting United States v. Stanley*, 765 F.2d 1224, 1239 (5th Cir. 1985).  Practical, not technical, considerations govern the validity of an indictment,[26] and the test of the validity of an indictment is "not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal

---

[26]    *See United States v. Maggitt*, 784 F.2d 590, 598 (5th Cir. 1986) (citation omitted).

constitutional standards."  *United States v. Webb*, 747 F.2d 278, 284 (5th Cir. 1984) (citation omitted), *cert. denied*, 469 U.S. 1226, 105 S. Ct. 1222 (1985); *see also United States v. De La Rosa*, 911 F.2d 985, 988-89 (5th Cir. 1990), *cert. denied*, 111 S. Ct. 2275 (1991); *United States v. Wilson*, 884 F.2d 174, 179 (5th Cir. 1989).  Because Chaney raises her indictment challenge for the first time on appeal, we review Count One with "maximum liberality"--that is, we will find Count One sufficient "unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant was convicted."  *See Shelton*, 937 F.2d at 143 (quotation omitted), *cert. denied*, 112 S. Ct. 607 (1991); *United States v. Wilson*, 884 F.2d 174, 179 (5th Cir. 1989); *United States v. Rivera*, 879 F.2d 1247, 1251 n.3 (5th Cir.) (citation omitted), *cert. denied*, 493 U.S. 998, 110 S. Ct. 554 (1989).

Excluding introductory allegations and alleged overt acts, Count One of the indictment, which charges that Chaney committed a false entry conspiracy in violation of 18 U.S.C. § 371, reads as follows:

<u>COUNT ONE</u>
(18 U.S.C. § 371)

That beginning on or about December 19, 1983, and continuing until on or about March 12, 1987, in the Western District of Texas, and elsewhere, the Defendants, BARBARA R. CHANEY, CHRIS A. CUMMINGS, LAWRENCE M. BOWER, did knowingly and wilfully combine, conspire, confederate and agree with each other, with Richard T. Cassidy, a principal not indicted herein, and others known and unknown to the Grand Jury, [to violate Title 18, United States Code, Section 656; that is to say . . . that Defendants . . . conspired with . . . BARBARA R. CHANEY, President of Western

-20-

Bank, and with Richard T. Cassidy, a principal not indicted herein, to wilfully misapply monies, funds and credits which had been entrusted to the care of Western Bank,] and further, *the said Defendants and unindicted co-conspirator caused to be made false entries in the books of said bank with* the intent to deceive the examiners of the Texas Department of Banking and the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 1005 . . . .[27]

Chaney claims that Count One charges her only with participating in a conspiracy to misapply bank funds, and that the indictment's false entries language does not refer back to the conspiracy-- that is, Chaney contends that she was not put on notice that the conspiracy for which she was charged included a second alleged objective of making false entries.

As recently stated by this court, "[a]n indictment's most basic purpose--a fundamental objective that *must* be realized--is `to fairly inform a defendant of the charge against him.'" *Hagmann*, 950 F.2d at 182 (emphasis in original) (citation omitted). Therefore, we look to see whether this basic purpose was realized, and we begin with the plain language of the indictment: After alleging that Chaney and others conspired to violate section 656, Count One charges that "the said Defendants and unindicted co-conspirator caused to be made false entries in the books of said bank." Beyond the literal clarity of its language, Count One is written to establish the essential elements of a section 371 conspiracy, which are:

---

[27] Emphasis added. After the district court granted Chaney's motion for judgment of acquittal as to all the 18 U.S.C. § 656 misapplication of funds counts and before it submitted the indictment to the jury, the court, at Chaney's request, redacted the bracketed language.

-21-

(1) an agreement by two or more persons to combine efforts ("Defendants . . . did knowingly and wilfully combine, conspire, confederate and agree with each other");

(2) for an illegal purpose ("to wilfully misapply monies, funds and credits" and "ma[ke] *false entries in the books of said bank with* the intent to deceive the examiners of the Texas Department of Banking and the Federal Deposit Insurance Corporation"); and

(3) an overt act by one of the members in furtherance of that agreement ("the said Defendants and unindicted co-conspirator caused to be made false entries in the books of said bank").

*See United States v. Schmick*, 904 F.2d 936, 941 (5th Cir. 1990), *cert. denied*, 111 S. Ct. 782 (1991); *United States v. Yamin*, 868 F.2d 130, 133 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S. Ct. 3258 (1989); *United States v. Gordon*, 780 F.2d 1165, 1170 (5th Cir. 1986). This interpretation of the meaning of Count One's actual language is reinforced by the fact that it is explicitly designated a conspiracy count by the citation to 18 U.S.C. § 371 in its heading. *See United States v. Boyd*, 885 F.2d 246, 249 (5th Cir. 1989) (statutory citation increases indictment's clarity); *Wilson*, 884 F.2d at 179 (statutory citation reinforces other references within the indictment); *United States v. Campos-Asencio*, 822 F.2d 506, 508 (5th Cir. 1987). Accordingly, we find that Count One sufficiently informed Chaney that she was charged with participating in a section 371 conspiracy with the dual objectives of misapplying funds and making false entries.

## C

Asserting that there is insufficient evidence to support her conviction, Chaney also challenges the district court's refusal

to grant her motion for judgment of acquittal for conspiracy to violate 18 U.S.C. § 1005 as charged in Count One.[28]  That Count alleges that Chaney, Bower, and Cummings, along with their unindicted co-conspirator, Richard Cassidy, conspired to make false entries in bank records related to nominee loans with the intent to deceive bank examiners.

It is well-established that juries are "free to choose among all reasonable constructions of the evidence"[29]--that is, we will affirm a jury's verdict if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Logan*, 949 F.2d at 1380 ("The ultimate test for sufficiency of evidence challenges is whether a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt."); *United States v. Nixon*, 816 F.2d 1022, 1029 (5th Cir. 1987), *cert. denied*, 484 U.S. 1026, 108 S. Ct. 749 (1988).  In other words, the "rule of reason" governs what a fact finder is permitted to infer from the evidence in a particular case, and fact finders may "use their common sense and evaluate the facts in light of their knowledge of the natural tendencies and inclinations of

---

[28]  Chaney does not challenge the sufficiency of the evidence supporting her conviction on Count Six of the indictment, the substantive section 1005 charge relating to the Officer's Questionnaire.

[29]  *United States v. Berisha*, 925 F.2d 791, 795 (5th Cir. 1991); *see United States v. Logan*, 949 F.2d 1370, 1380 (5th Cir. 1991), *cert. denied*, 112 S. Ct. 1597 (1992); *United States v. Molinar-Apodaca*, 889 F.2d 1417, 1423 (5th Cir. 1989); *United States v. Punch*, 722 F.2d 146, 153 (5th Cir. 1983).

human beings." *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989) (quotation omitted). In applying this rule of reason standard, "this Court is obliged to view the evidence, whether direct or circumstantial, and all inferences reasonably drawn from it, in the light most favorable to the verdict." *Molinar-Apodaca*, 889 F.2d at 1423; *see also Berisha*, 925 F.2d at 795; *Logan*, 949 F.2d at 1380; *United States v. Bryant*, 770 F.2d 1283, 1288 (5th Cir. 1985) (standard of review is same whether evidence is direct or circumstantial), cert. denied, 475 U.S. 1030, 106 S. Ct. 1235 (1986). To sustain a jury verdict, the evidence certainly need not exclude every reasonable hypothesis of innocence nor be inconsistent with every conclusion except that of guilt. *See United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S. Ct. 2398 (1983).

To establish a substantive violation of section 1005, the government must prove that: (1) an entry made in bank records is false; (2) the defendant made the entry or caused it to be made; (3) the defendant knew the entry was false at the time he or she made it; and (4) the defendant intended that the entry injure or defraud the bank or public officers.[30] *See United States v.*

---

[30] The purpose of section 1005 is to ensure that inspection of a bank's books will yield an accurate picture of that bank's condition. *See United States v. Cordell*, 912 F.2d 769, 773 (5th Cir. 1990); *cf. United States v. Darby*, 289 U.S. 224, 226, 53 S. Ct. 573, 574 (1933). During the time of the acts alleged in Count One, section 1005 read, in pertinent part:
> Whoever makes any false entry in any book, report, or statement of [any Federal Reserve bank, member bank . . . insured bank . . . ] with intent to injure

-24-

*Kington*, 875 F.2d 1091, 1104 (5th Cir. 1989); *United States v. Jackson*, 621 F.2d 216, 219 (5th Cir. 1980). The government need not prove intent to cause the bank injury; all that is required is that the defendant intended to defraud one or more of the bank's officers, auditors, examiners, or agents. *See United States v. Tullos*, 868 F.2d 689, 695 (5th Cir.), *cert. denied*, 490 U.S. 1112, 109 S. Ct. 3171 (1989), *citing United States v. Stovall*, 825 F.2d 817 (5th Cir. 1987). To establish a conspiracy under 18 U.S.C. § 371, the government must prove beyond a reasonable doubt that the defendant entered into an agreement with at least one other person to commit a crime against the United States and that *any one* of these conspirators committed an overt act in furtherance of that agreement. *See United States v. Schmick*, 904 F.2d 936, 941 (5th Cir. 1990); *United States v. Yamin*, 868 F.2d 130, 133 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S. Ct. 3258 (1989); *see also supra* Part II.B. The government must also prove that the defendant knew of the conspiracy and voluntarily became part of it. *Yamin*, 868 F.2d at 133. The existence of a conspiracy may be proved by circumstantial evidence. *Id*. The agreement between or among co-conspirators also may be proved by circumstantial evidence. *See United States*

---

or defraud . . . the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank . . .
        Shall be fined not more than $5,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1005 (1988). Congress amended section 1005 in 1989 to, among other things, increase the possible penalty to $1,000,000 and twenty years imprisonment. *See* 18 U.S.C.A. § 1005 (West Supp. 1992).

*v. Goff*, 847 F.2d 149, 168 (5th Cir.), *cert. denied*, 488 U.S. 932, 109 S. Ct. 324 (1988).

According to Chaney, because she was acquitted of making false statements in the loan files of the bank as was charged in Count Six,[31] there is no overt act to support the charge that she conspired to make a false statement on the Officer's Questionnaire or otherwise conspired to falsify bank records.[32] Chaney contends that she is not challenging her conspiracy conviction under Count One based upon an inconsistent jury verdict;[33] rather, she asserts that her conspiracy acquittals on

---

[31]    *See supra* note 17 (summarizing indictment).

[32]    Specifically, Chaney asserts that,
> [e]ven assuming that [she] were guilty on Count Six, that she intentionally lied to the bank examiners by denying that she had any loans at the bank that were made for the accommodation of others than those whose names appeared in the records of the bank, there is simply no evidence that indicates she conspired with anyone to commit this offense.
>                    * * *
> [She] participated, with her co-defendants, in making the loans, which the jury did not find to be illegal. She, on her own, later characterized the loans in a way that the jury found to be inaccurate, and therefore illegal. The government presented no evidence of a conspiracy. Accordingly, this conviction must be reversed.

Brief for Appellant at 30, *United States v. Chaney*, No. 91-8206 (5th Cir. filed Sept. 11, 1991). Since there is ample evidence in the record to support the agreement element of this conviction (*see infra* note 40), our discussion is limited to Chaney's contention that the government has failed to establish an overt act in furtherance of the conspiracy for which she was convicted.

[33]    It is well-settled that a defendant cannot challenge her conviction based upon inconsistent jury verdicts. *See, e.g., United States v. Powell*, 469 U.S. 57, 64-67, 105 S. Ct. 471, 476-77 (1984) ("We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts . . . ."); *cf. United States v. Zuniga-Salinas*, 952 F.2d

-26-

other counts demonstrate that there is a lack of evidence to support such a conviction under Count One.  We disagree.

At trial, Chaney did not dispute that she had approved all the loans at issue.  In fact, Chaney admitted knowing that the borrowers and their interests were related,[34] and that she had violated her own lending policy by lending more than $600,000 to a related group of borrowers.[35]  It is clear that the loans made to this related group of borrowers grossly exceeding the legal lending limit of Western Bank and the lending policy instituted in 1983 by Western Bank.[36]

Moreover, the record establishes that Chaney acted to conceal the relatedness of these borrowers and the true nature of

---

876, 878 (5th Cir. 1992) (en banc) ("An inconsistent verdict should no longer be a bar to conviction where all other co-conspirators are acquitted.").

[34]    Specifically, Chaney:  acknowledged that Cassidy, RAC, CCG, "and the other borrowers" were related borrowers; agreed that CCG, Bower, Cummings, and Wallace were "all a group of related borrowers"; admitted that she was aware that the Cassidy and Bower loans were related; that Cassidy "was well known to have officed with Mr. Cummings and been associated with [Bower and Wallace]"; and that she was aware that Cassidy, Bower, Wallace, and Cummings had worked together on various real estate projects.  Record on Appeal, vol. 4, at 192, 194, 217, 219-21, 227, 233 (Chaney testimony).

[35]    Chaney testified as follows:
Q    Well, I think my question was, you violated your own lending policy by extending more than six hundred thousand dollars to a "related group of borrowers", didn't you?
A    Yes.
Record on Appeal, vol. 4, at 217.

[36]    *See* *supra* notes 2, 10 and accompanying text.

the loans at issue.[37]  The transactions underlying Chaney's

conviction involve a series of loan upgrades in which the

expanding debt and underlying collateral were shifted among a

group of individuals with a shared interest in gaining access to

Western Bank funds.[38]  Effecting these transactions required the

preparation of numerous documents--documents that contain both

false entries and factual omissions which disguised the nature of

the loans and actual borrowers from Western Bank and the TDB

---

[37]     *See* *supra* Parts I.A and I.B.

[38]     *See* *supra* Part I.B.

examiners.[39]  Accordingly, we affirm Chaney's conviction for

---

[39]    Chaney was charged under Count One with conspiracy to falsify Western Bank records.  The omission of material information, as well as actual misstatements, qualifies as a false entry under 18 U.S.C. § 1005 and can serve as the requisite overt act for conspiracy under 18 U.S.C. § 371.  *See United States v. Cordell*, 912 F.2d 769, 773 (5th Cir. 1990) (holding that omission of material information qualifies as false entry for section 1005 purposes); *United States v. Kington*, 875 F.2d 1091, 1105 (5th Cir. 1989) (stating that defendants need only have conducted transactions in way that would purposely defeat reporting requirements).  The record is bursting with evidence that Chaney and other actors conspired to make such omissions and misstatements:  Bower and Chaney made false entries on Western Bank loan documents for the $200,000 loan negotiated July 19, 1984--although they knew that the proceeds would be commingled with those of RAC, Chaney and Bower made it appear as though CCG was the actual borrower; Chaney directed her assistant to prepare a loan presentation for the $265,000 loan and caused the purpose section to be left blank; Chaney caused documents for the $550,000 loan to reflect that RAC was the borrower when $285,000 of the proceeds went to CCG and caused spread sheets for that loan to fail to reflect any related debt at Western Bank; Chaney authorized a $600,000 loan on December 28, 1984, and caused the bank records to show that COR was the borrower when the proceeds actually paid off a Western Bank loan to CCG; Chaney and Bower explicitly agreed that they would use Cassidy's name on loan documents for the $645,000 loan when the knew that the real borrower was RAC and, to effect this loan, caused the loan request documents to falsely list Cassidy as the actual borrower; Chaney caused the spread sheets for this loan to fail to (1) specify any related debt at Western Bank and (2) list related collateral, such as section 1 of block 5, which Bower used as collateral for loans in his name, and later caused the loan renewal work sheet to falsely indicate that the loan was for an individual; Chaney caused her assistant to prepare spread sheets for the $650,000 loan in Bower's name when she knew that the loan was actually to RAC, and she also failed to indicate that there was related debt at Western Bank; Bower submitted misleading appraisals of public school lands in support of loans made in the names of Bower and Cassidy with the intent to deceive bank examiners into believing these loans were adequately collateralized; when authorizing the $440,000 loan to Bower in November 1985, Chaney falsely indicated that the loan proceeds would be used to pay off Bower's indebtedness to Montwood National Bank when Chaney and Bower knew that $224,000 of the loan was to be used for a down payment on real estate; and, one month after renewing this $440,000 loan, Chaney falsely indicated on her Officer's Questionnaire that she had made no nominee ("sham") loans since the last bank examination.  *See supra* Parts

-29-

conspiracy to make false entries.

## D

Finally, Chaney contends that the district court erred in imposing joint and several liability among Chaney and her co-defendants for restitution in the amount of $1,141,285.[40] According to Chaney, no loss flowed from the offenses of conviction--that is, from Chaney's conviction for conspiracy to make false entries (Count One), and from her conviction on the substantive false entry charge relating to the Officer's Questionnaire (Count Six)--and no restitution is appropriate.[41]

## 1

Restitution under the Victim and Witness Protect Act (VWPA)[42] is limited to losses caused by the specific conduct that is the basis of the offense of conviction, *Hughey v. United*

---

I.A and I.B.

[40] The district court originally ordered Chaney to pay restitution in the amount of $1,926,681. The only explanation in the record for this reduction is testimony from Bower's sentencing hearing that the $440,000 loan had been paid. The government has requested that this court take judicial notice of this portion of the *Bower* record. Brief for the United States of America at 63 n.32, *United States v. Chaney*, No. 91-8206 (5th Cir. filed Dec. 20, 1991).

[41] Specifically, Chaney asserts that "[t]he loss to the bank, if it was caused by any of Mrs. Chaney's acts, was caused by the making of the loans. Mrs. Chaney was acquitted on the counts relating to the making of the loans. Therefore, the restitution was improperly imposed." Brief for Appellant at 31, *United States v. Chaney*, No. 91-8206 (5th Cir. filed Sept. 11, 1991) ["Chaney Brief"].

[42] 18 U.S.C. §§ 3579-3580 (1982 ed.) (renumbered §§ 3663, 3664 pursuant to Pub.L. 98-473, Title II, c. II, § 235, Oct. 12, 1984, 98 Stat. 2031) (VWPA).

-30-

*States*, __ U.S. __, __, 110 S. Ct. 1979, 1984 (1990), but we have held that this VWPA restriction is not applicable to cases involving restitution ordered pursuant to the Federal Probation Act, 18 U.S.C. § 3651 (repealed eff. Nov. 1, 1986) (FPA). *See United States v. Hunt*, 940 F.2d 130, 131 (5th Cir. 1991).[43] Chaney's offenses were committed while the Probation Act was in effect, and the record is not conclusive as to whether the district court ordered restitution under the Probation Act or under the VWPA. As stated in *United States v. Cook*, 952 F.2d 1262, 1264 (10th Cir. 1991), "where both statutes authorize restitution, district courts should specify whether the FPA or VWPA governs." When district courts fail to do so, "unless a clear intention appears to the contrary, we will assume restitution orders are made pursuant to the broader provisions of the VWPA." *Id., citing United States v. Padgett*, 892 F.2d 445, 448 (6th Cir. 1989); *see United States v. Kress*, 944 F.2d 155, 158 (3d Cir. 1991) ("Where the district court fails to specify

---

[43]    *See also United States v. Haile*, 795 F.2d 489, 491 (5th Cir. 1986) (Section 3651 of the Probation Act "gives broad authority to district courts to impose conditions of probation that in the judgment of the sentencing judge serve to rehabilitate the criminal or secure compliance with court orders, and otherwise are in the public interest.") (holding, however, that FPA precludes monetary penalties other than those enumerated in the statute); *United States v. Van Cauwenberghe*, 827 F.2d 424, 435 (9th Cir. 1987) (holding that joint and several liability for entire actual loss could have been imposed on each fraud defendant as condition of probation), *cert. denied*, 484 U.S. 1042, 108 S. Ct. 773 (1988); *United States v. Tzakis*, 736 F.2d 867, 871 (2d Cir. 1984) (holding that district court did not abuse its discretion by imposing on defendant, as condition of probation, joint and several liability with co-defendant for restitution of full amount of losses caused by their crime).

whether the FPA or the VWPA authorized its actions, the general rule is that the VWPA controls."), *cert. denied*, 112 S. Ct. 1163 (1992).

Restitution under the VWPA is a criminal penalty and a component of the defendant's sentence. *See United States v. Snider*, 957 F.2d 703, 705 (9th Cir. 1992); *id*. at 1113 ("Because restitution under the VWPA is a criminal penalty, its imposition must comport with the substantive and procedural requirements of due process."). Therefore, when the legality of a restitution award is questioned, we review that award de novo. *See United States v. Badaracco*, 954 F.2d 928, 942 (3d Cir. 1992) (stating that review of restitution order is bifurcated: plenary review over whether the award is permitted under law is followed by review of the particular award for abuse of discretion); *United States v. Cook*, 952 F.2d 1262, 1263 (10th Cir. 1991); *Snider*, 945 F.2d at 1110. If we conclude that the sentence is legal, we then review the restitution award for abuse of discretion. *See United States v. Gelais*, 952 F.2d 90, 97 (5th Cir. 1992) (finding that the "district court neither abused its discretion in choosing not to articulate its findings nor in determining the amount of restitution"); *United States v. Ryan*, 874 F.2d 1052, 1054 (5th Cir. 1989) (Where defendant challenged award of restitution pursuant to the VWPA, holding that "[d]istrict courts are accorded broad discretion in ordering restitution.").

The government charged, and the jury found, Chaney guilty of (1) the general, substantive charge of conspiring to make false entries in Western Bank records and (2) making a false statement on the Officer's Questionnaire--that is, Chaney failed to disclose that she had made extensions of credit to benefit those whose names did not appear on bank records in connection with these extensions.[44]  This scheme for which Chaney was convicted is amorphous by nature, but we have found that Count One was defined with enough specificity to sustain Chaney's challenge to its sufficiency.[45]

Restitution under the VWPA is limited to losses resulting from the specific conduct underlying Chaney's convictions.  *See Hughey v. United States*, __ U. S. __, 110 S. Ct. 1979, 1983-84 (1990).   Although there is overlap between the charges within Chaney's indictment,[46] Chaney was convicted on the more general Count One--the conspiracy count alleging the overall scheme.  We will not be distracted by inconsistencies in the jury's verdict: *Hughey* holds that "Congress intended restitution to be tied to the loss caused by *the offense of conviction*[,]"[47] and, as in *Hughey*, our analysis builds upon the *conduct for which Chaney was*

---

[44]     *See supra* note 17 (summarizing indictment).

[45]     *See supra* Part II.B.

[46]     *See supra* note 17.

[47]     *Hughey*, __ U.S. at __, 110 S. Ct. at 1984 (emphasis added).

*convicted.*  Accordingly, we reject Chaney's proposal that we turn the *Hughey* rule inside-out, interpreting it as "Restitution under the Victim and Witness Protect Act is forbidden for losses that may be attributed to conduct that is the basis of charges for which the defendant is acquitted."[48]

---

[48]    Chaney's interpretation of *Hughey* is simply too broad. We are not confronted with a situation in which Chaney was acquitted of conduct that completely and conclusively encompasses the conduct underlying her convictions.  At the very least, the conduct supporting her convictions protrudes outside the edges of the more specific conduct underlying her acquittals.  *See supra* note 17 (summarizing indictment).  This disparity in breadth between the conduct underlying Chaney's convictions and the conduct underlying her acquittals distinguishes Chaney's case from those she cites as authority--cases in which defendants were charged with specificity and courts held that they could not be required to make restitution for losses resulting from this same specific conduct.  *See, e.g., United States v. Kane*, 944 F.2d 1406, 1415 (9th Cir. 1991) (where overt acts charged in counts on which defendant was acquitted were same as overt acts alleged in conspiracy count on which defendant was convicted, holding that defendant could not be required to make restitution for losses from conduct for which defendant had been specifically charged and acquitted); *United States v. Sharp*, 941 F.2d 811, 813 (9th Cir. 1991) (holding that defendant could not be ordered to make restitution based on entire $8,500,000 wire fraud scheme when he pleaded guilty to only one count of wire fraud alleging a $3,000 fraudulent transfer).  This same distinction holds true for *Hughey*, where, pursuant to a plea agreement, Hughey pled guilty to using one unauthorized credit card and the district court ordered restitution for his theft and use of 21 cards.  Noting that "[t]he essence of a plea agreement is that both the prosecution and the defense make concessions to avoid potential losses[,]" the United States Supreme Court reversed the district court's restitution order, holding that a VWPA restitution award is authorized only for the losses caused by the one unauthorized credit card use that was the basis of Hughey's conviction.  Our survey of other cases--cases decided subsequently to those cited by the parties--limiting restitution orders in accordance with *Hughey* also involve instances where a defendant has been charged with and convicted of specific conduct and courts have limited restitution to the losses resulting from that specific conduct; in many of these cases, as in *Hughey*, defendants entered into plea agreements which constrained restitution.  *See, e.g., United States v. Clark*, 931 F.2d 292, 297 (5th Cir. 1991) (where defendant pled guilty to four counts of aiding and abetting false

-34-

It is well-established that, as a participant in the false entry conspiracy, Chaney is legally liable for all the actions of her co-conspirators in furtherance of this crime. *See United States v. Kissel*, 218 U.S. 601, 608, 31 S. Ct. 124, 126 (1910) ("[T]he conspiracy continues up to the time of abandonment or success.") ("A conspiracy is a partnership in criminal purposes . . . [and] an overt act of one partner may be the act of all without any new agreement specifically directed to that act."); *see also Hyde v. United States*, 225 U.S. 347, 369, 32 S. Ct. 793, 803 (1912) (the liability of an individual conspirator continues until the conspiracy accomplishes its goals or that conspirator withdraws, the latter of which requires an affirmative action). Conspiracy is, therefore, a continuing

statements to a federally insured savings and loan, holding that government cannot exceed convictions it bargained for by ordering restitution for other counts); *see also United States v. Young*, 953 F.2d 1288, 1290 (11th Cir. 1992) (where defendant approved at least thirty loans in exchange for "gifts" while acting as a bank loan officer, and then pled guilty to only two counts of accepting and receiving a commission or gift in connection with a loan approval, holding that restitution had to be limited to losses resulting from those two offenses); *United States v. Wainwright*, 938 F.2d 1096, 1098 (10th Cir. 1991) (where defendant pled guilty to one count of bank fraud, holding that restitution ordered encompasses losses stemming from charges which were dismissed).

Moreover, even if we were to follow the approach Chaney proposes by eliminating all conduct for which Chaney was acquitted, Chaney was generally charged and convicted of conspiring to make false entries in Western Bank records. Chaney was acquitted only of specific conduct--conduct included within Charge One but not encompassing the conduct alleged in that charge. Therefore, the district court was not precluded from basing its restitution award on losses resulting from the conduct protruding beyond her acquittals, such as the false entries made in connection with the three renewals--November 1985, May 1986, and September 1986--of the $645,000 loan. *See generally supra* note 39 (listing other instances of false entries and omissions).

offense and, in accordance with this principle, "[t]he district court had the authority to order restitution for the losses caused by the entire fraud scheme, not merely for the losses caused by the specific acts of fraud proved by the government at trial." *United States v. Brothers*, 955 F.2d 493, 497 (7th Cir. 1992) (holding that restitution order did not exceed scope of convictions where defendant, challenging that order under *Hughey*, argued that district court could only require restitution for checks he was convicted of improperly receiving) (remanded on grounds that restitution order was unacceptably vague), *discussing United States v. Bennett*, 943 F.2d 738, 741 (7th Cir. 1991); *see United States v. Wallen*, 953 F.2d 3, 5-6 (1st Cir. 1991) (holding that, "although it may encompass a number of underlying acts, a RICO conviction is a conviction for a single offense" for VWPA purposes and a defendant may be ordered to pay restitution for all losses resulting from this continuing offense); *Bennett*, 943 F.2d at 741 (7th Cir. 1991) (where eighty acts constituting mail fraud scheme were discussed in plea agreement but only two specific fraudulent acts supported defendant's two mail fraud convictions, holding that district court had authority to order restitution for losses caused by entire scheme).

Because they caused Western Bank to issue and then not question the cumulative loans, the false entries effected by Chaney and her co-conspirators,[49] along with Chaney's failure to

---

[49]    *See supra* note 39 and accompanying text.

accurately respond to question five on the Officer's Questionnaire,[50] were part of a continuing conspiracy offense and they are inextricably related to the losses suffered as a result of default on the loans.[51]  Accordingly, we affirm both the district court's award of restitution and the joint and several liability imposed upon Chaney for that restitution.[52]

---

[50]     *See supra* note 18.

[51]     Chaney's convictions do not leave us with unidentified victims.  *See United States v. Angelica*, 951 F.2d 1007, 1009 (9th Cir. 1991) (ordering district court to redetermine amount of restitution where restitution order encompassed losses sustained by fifteen victims, seven of whom were not subjects of counts of conviction).  Rather, Chaney's entire case centered around a focused conspiracy by a related group of individuals to gain access to Western Bank funds through specific loans.  The loss resulting from this conspiracy--the sum total of loans made possible by Chaney's misstatements and failure to disclose information--was also precisely defined.  Therefore, although the jury did acquit Chaney of charges that rely upon specific instances of conduct within this overall conspiracy, Chaney was convicted of generally participating in a well-defined conspiracy--a conspiracy with identified actors and focused objectives.  This distinguishes Chaney from *United States v. McHenry*, 952 F.2d 328 (9th Cir. 1991), *amended*, 1992 WL 103088, where the Ninth Circuit held that,
    [a]ccording to the district court, however, the unnamed
    `victims' of the conspiracy are entitled to a refund.
    Apparently the district court assumed the jury believed
    that the defendants committed each and every act
    alleged by the government.  This assumption is not
    warranted by the verdict.  At most, it reveals that the
    jury did not believe the government proved mail and
    wire fraud beyond a reasonable doubt, but that the
    government did satisfy this burden with respect to the
    conspiracy count.
*Id*. at *3.

[52]     *See United States v. Hand*, 863 F.2d 1100, 1106 (3d Cir. 1988) (Holding that, in ordering restitution under the VWPA, the fact that the burden of restitution lays entirely on one defendant were two co-defendants were equally culpable did not offend the Constitution and "certainly . . . did not constitute an abuse of discretion."); *see also United States v. All Star Industries*, No. 91-2439 (5th Cir. 1992) (holding that district

-37-

## III

For the foregoing reasons, we AFFIRM.

---

court did not abuse its discretion in imposing joint and several liability for all losses to victims of four-year conspiracy proved at trial); *United States v. Van Cauwenberghe*, 827 F.2d 424, 435 (9th Cir. 1987) (holding that joint and several liability for entire actual loss could have been imposed on each fraud defendant as condition of probation); *cert. denied*, 484 U.S. 1042, 108 S. Ct. 773 (1988); *United States v. Tzakis*, 736 F.2d 867, 871 (2d Cir. 1984) (holding that district court did not abuse its discretion by imposing on defendant, as condition of probation, joint and several liability with co-defendant for restitution of full amount of losses caused by their crime).